No. 5164.

## WILLIAM PORTER *v.* THE STATE.

23 295
35 591

THEFT—INTENT—CHARGE OF THE COURT—FACT CASE.—In order to sustain
a prosecution for theft when the taking was originally lawful (Penal Code,
art. 727), the proof must show either that the taker obtained the lawful
possession of the property by some false pretext, which induced or de-
ceived the owner to surrender the possession of the property to him; or
that, at the time he obtained the possession of the property with the
consent of the owner, he intended to deprive the owner of the value of
the same, and to appropriate it to his own use. See the opinion for a
charge of the court on the subject *held* correct. And see the statement
of the case for evidence *held* sufficient to support a conviction for theft of
money obtained from the owner by false pretext.

APPEAL from the District Court of Collin. Tried below before
the Hon. H. O. Head.

The indictment jointly impleaded the appellant, Charles Wil-
son, Albert Redding and Robert Bagley, and charged them with
the theft, in Collin county, Texas, on December 17, 1886, of
ninety-five dollars in money, the property of M. A. Tolan. The
appellant being alone on trial, he was convicted, and his penalty
was assessed at a term of three years in the penitentiary.

M. A. Tolan was the first witness for the State. He testified,
in substance, that on the seventeenth day of December, 1886, he
left the town of Foster, in Hunt county, Texas, en route to his
former home in Tishomingo county, Mississippi. He reached
McKinney, Collin county, about eight o'clock on the same night.
While standing at the depot waiting for the train he was to take,
he was approached by the defendant, who said that his name
was Johnson, and that he lived at Malvern, Arkansas. The de-
fendant placed his hand on witness's shoulder and proposed to
go to the saloon up town and take a drink. Witness replied
that he did not drink, and moreover, he intended to take the
train on his way to Mississippi, and might miss it by going to
the saloon. Defendant replied that the train was not due until
eleven o'clock, and insisted so earnestly that the witness finally
yielded, and went with him to the Elm saloon. Defendant took
a drink at the bar, and asked the bar tender how "things" were

getting along up stairs. The bar tender replied that he supposed they were getting along all right, as he heard some of the boys up there. Defendant then asked witness to go up stairs with him. Witness declined, saying that he would go back to the depot in order to run no risk of missing the train, as he, had to get to Sherman to get his through ticket. Defendant replied that there was ample time to catch the train; that he was going on the same train to Malvern, Arkansas, and insisted until witness went with him up stairs. They found Albert Redding, Bob Bagley and Charley Wilson—parties whom witness had never seen before—engaged in a game of cards. Defendant asked what chance he had of entering the game. One of the parties replied that his chance was good if he had two dollars and a half. Defendant bought some checks and joined in the game. After playing a while the defendant asked the witness to lend him two dollars. Witness objected, but the crowd assured him that his money would be returned to him at the conclusion of the game. Witness reluctantly handed the two dollars to the parties at the table. Presently the defendant called upon witness for a further advance of ten dollars. Witness again demurred, but, as before, the crowd assured him that the money would be returned to him at the conclusion of the game, and he handed it to the parties. This system of borrowing and lending was kept up until witness had lent ninety-seven dollars, when the parties ostensibly got into a row among themselves, grabbed witness's pocket book, tore it open to see if it contained any more money, blew the lights out, threw the cards away, and defendant went down the steps. Witness remained in the room to demand the return of his money from the other parties They refused to give him back his money, one of them remarking: "Oh, hell! you have got no money!" Witness then went down stairs and found defendant talking to some one he, witness, did not know. Witness asked defendant for his money. The stranger proposed to go to the saloon and get a drink. Witness proposed to go to the depot. Defendant and the stranger went into the saloon, got a drink and then went with witness to the depot. Arrived at the depot, the stranger, whose name, it transpired, was D. C. Gilbert, went into the office, and came out saying that his valise had been stolen. Defendant then looked around and said that his valise had also been stolen. Defendant then went up town, for the purpose, they said, of getting an officer to look for the valises.

Cross examined, the witness stated that, though he had before seen playing cards in show cases and display windows of stores and huckster shops, he had never seen cards played before, and did not know one from another. He denied that he drank whisky or other liquor on that night, or that he treated the defendant or any other person to liquor on that night, or that he sat down at the gambling table in the gambling room, or that he participated in any way in the game. One of the loans made to defendant was twenty-five dollars. To make that loan witness placed two twenty dollar gold pieces on the table. A pile of checks was placed before him (witness) as change. Witness did not take them. Witness denied that, at the depot, after the transaction in the gambling room, and after defendant left, ostensibly to get an officer to look for his valise, he told Gilbert he had been gambling over the Elm saloon and lost between eighty and ninety dollars. He did ask Gilbert if he thought defendant would come back, but did not say in connection with that question that defendant had promised to pay, or to lend him, money to pay his fare to Sherman. Witness observed a number of negroes about the depot, but did not say, in the presence of the negroes Shaffer and Hodge, that he lost eighty-two dollars in a game of poker that night. The witness denied that since the first trial of this case, at this term, he told Mr. Phillips that, as a matter of fact, he, witness, did not go to the gambling room over the saloon, but was thrown down by defendant and the others indicted, near the depot, and robbed. The witness denied that on one occasion since the former trial of this case, he bantered C. C. Green to a game at "seven up" with cards for a drink of whisky. If John Burge was in the gambling room at any time while witness was in there, witness did not see him. The witness denied that, pending the former trial of this case, while the jury was being organized, he asked one T. J. New if he knew any of the jurors then impaneled, and then confided to him the information that he, witness, was the man who was robbed, with the request to New to consult his acquaintances on the jury in witness's behalf. Witness also denied that, since the former trial, he told the city marshal, Todd Warden, that "those smart fellows" were mistaken in supposing that they got all of his money, and that he still had one hundred and fifty dollars in Greenville. He did not invite Warden to drink with him.

Todd Warden, the next witness for the State, testified, in sub-

stance, that he was at the depot in McKinney at the time of the
alleged robbery of Tolan.   When informed of that circumstance
on that night, he repaired to the Elm saloon, and on that same
night arrested defendant, Charley Wilson and John Burge for
gambling.   The arrest was made outside of the saloon. Defend-
ant took the witness into the Elm saloon and paid him eigh-
teen dollars and fifty cents, each, for himself and Wilson, and
they were released.   This money was paid to witness with in-
structions to appear for them before the mayor's court on the
morrow, plead guilty for them, and pay their fines, which wit-
ness did.   A twenty dollar gold piece was a part of the money
paid witness by defendant.   Burge paid defendant some money
after the arrest.   When arrested, Burge said that he was at the
whore house, and was not in the gaming room while the gam-
bling was going on. Witness, however, took Burge to Mr. Todd,
who signed his appearance bond, and Burge was released.   Wit-
ness arrested defendant, Wilson and Burge on a charge of gam-
bling, and not for robbing Tolan.

Cross examined, the witness said that he talked to Tolan on
the night of the alleged robbery.   He knew that Tolan had been
drinking, and thought that he was then drunk.  Since the former
trial of this case at this term. the witness met Tolan on the
streets, and declined his invitation to go to a saloon for a drink.
During the conversation which ensued, Tolan said that "those
smart fellows" thought they got all the money he had, but that
he still had a hundred and fifty dollars in Greenville.   Witness
was not called upon by defendant or other person, on the night
of the alleged robbery, to look for a stolen valise.

William Pittman testified, for the State, that, between nine
and ten o'clock on the night of the alleged robbery, he met the
defendant and Tolan going towards the depot.   As he passed,
witness said to defendant: "Bill, did you know that Miss
Slaughterbuck (a noted prostitute), had come to town?" The de-
fendant replied: "You are mistaken in your man; my name is
Johnson."

Joe Rambo testified, for the State, that, on the night of the
alleged robbery, he changed a twenty dollar gold piece for the
defendant.

Griff Smith testified, for the State, that he lived in the town of
Foster, Hunt county, Texas, where he had known Tolan for the
last four years.   Tolan left Foster early in December, 1886.
About ten days before Tolan left, witness counted his money for

him, and found that he had four twenty dollar gold pieces, a ten dollar bill, and seven dollars and fifty cents in silver. Witness then paid him a five dollar bill, which he owed. Up to that time witness had paid Tolan fifty-three dollars and seventy-five cents for services.

Jerome Mitchell, of Foster, testified, for the State, that, at one time in December, 1886, he paid Tolan sixty dollars in gold, and at another time eighty dollars in gold. Witness paid Tolan two hundred dollars in all, during the fall and winter of 1886.

Frank Mack testified, for the State, that on the day after the alleged robbery he saw the defendant in a barber shop in McKinney, at which time he had a twenty dollar gold coin in his possession.

The State closed.

D. C. Gilbert was the first witness for the defense. He testified that he first saw Tolan in Rambo's saloon on the night of the alleged robbery. He was unable to say whether or not he (Tolan) drank at Rambo's saloon, but knew that he drank at the Elm saloon. From the Elm saloon witness, defendant and Tolan went together to the depot. After defendant left the depot, Tolan told witness that he had been gambling over the Elm saloon that night, and had lost between eighty and ninety dollars. He then told witness that defendant promised to pay his way to Sherman, and asked witness if he thought the defendant would come back to the depot that night. The witness was not in the game of cards, and then knew none of the parties said to have been engaged in it.

Cross examined, the witness said that he came to Texas from New York, as the agent of the Triple Alliance Show. That institution went to pieces in Dallas on the seventh of December, and witness went to work in Ed Finley's lunch stand in McKinney. Witness had no recollection of claiming at the depot, on the night of the alleged robbery, to have lost his valise, nor did he hear the defendant say that his valise had been stolen. Witness was under the influence of whisky on the night of the alleged robbery.

Henry Hodge and Sam Shafer, two negro witnesses for the defense, testified, in substance, that, while at the depot waiting to take the train to Melissa, they overheard Tolan, in a conversation with Bob Obenchain, say that he had lost some money that night in a game of poker.

T. J. New testified, for the defense, that he was a member of

the regular jury when this case was called at the former trial on a previous day of this term. Upon the organization of the jury the witness was rejected, and retired to the rear of the court room, where he found a seat next to Tolan, whom he did not then know. Tolan asked the witness if he knew any of the jurors then accepted and in the box. Witness replied that he knew one man. Tolan then said that he was the man who was robbed, and asked witness to see the man he knew and talk to him for him (Tolan). The witness told Tolan in reply that he was not permitted to talk to jurors.

John Williams and George Kelly, testifying for the defense, said that they saw Tolan drink whisky on the night of the alleged robbery. Kelly stated that he knew Tolan took as many as a half a dozen drinks of whisky.

C. C. Green testified, for the defense, that, one day during the present term of the court, since the first trial of this defendant, while he and Tolan were engaged sacking oats, Tolan bantered him to play a game of seven up with cards. Witness claimed his privilege and declined to answer whether or not he accepted Tolan's challenge and played the game. Witness did not know the defendant, nor did he know either of the parties indicted as participants with him in the perpetration of this offense.

Josh Phillips testified, for the defense, that shortly before this trial Tolan told him that defendant and those acting with him robbed him near the depot in McKinney, and that he, Tolan, did not go into the gambling room over the Elm saloon on that night.

George T. Armstrong, mayor of the town of McKinney, testified, for the defense, that among those brought before him on the day after the alleged robbery, for identification by Tolan, was John Burge. Tolan testified before witness that Burge was in the gambling room at the time, but had nothing to do with the taking of his money.

John Burge testified, for the defense, that he went into the gambling room over the Elm Saloon about nine o'clock on the night of the alleged robbery, and found defendant, Tolan, Bob Bagley, Charley Wilson and Albert Redding engaged in a game of stud-poker. Tolan bought chips to the amount $97 while witness was in the room, and bet and lost them on the game. Toland did not lend the money to defendant or either of the other parties, but spent it for chips which he lost playing against the game. Witness had no part nor interest in the game, nor did

he get any of the money played that night. Witness was arrested by Todd Warden that night, gave bond, and on the next day was discharged. He did not tell Warden that he was not in the gambling room that night, but did tell him that he was not there but at the whore house when the game began.

Bob Bagley, Albert Redding and Charley Wilson, the co-defendants in this case who had been tried and acquitted, were introduced by the defendant as witnesses, and concurred in testifying that Tolan engaged in the game of stud poker voluntarily, bought chips of his own volition, played them upon his own judgment, and lost ninety-seven dollars.

The defense closed.

Joe Rambo testified, for the State, in rebuttal, that on the night of, but after the alleged robbery, he heard John Burge say that he was "d—d glad he was not in the gambling room on that night; that if he had been he would be with the boys in this trouble."

William Pittman testified, for the State, in rebuttal, that on the night of the alleged robbery he heard John Burge tell Warden that he was not in the gambling room during the game, but was at the whore house.

Bob Obenchain, testifying for the State, in rebuttal, said that Tolan did not, as testified by Hodge and Shafer, at the depot, or elsewhere, on the night of the alleged robbery, tell him that he, Tolan, had lost eighty-two dollars, or any other sum of money, on that night, in a game of cards.

The motion for new trial assailed the competency and sufficiency of the evidence to support the verdict, and the correctness of the charge of the court discussed in the opinion.

*K. R. Craig* and *Garnett & Muse*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. In explaining the meaning and comprehensiveness of the word "taking," as used in our statutory definition of theft, Article 727 of the Penal Code provides, amongst other things, that "if the taking, though originally lawful, was obtained by any false pretext, or with any intent to deprive the owner of the value thereof and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense of theft is complete." This

is where the possession of property has been acquired lawfully by the taker,—that is, where the owner consents to part with the possession of his property, and the taker obtains possession by virtue of such consent.   In such cases the taker may be guilty of theft, notwithstanding such lawful possession, by one or the other of the two modes mentioned in the statute; that is, first, by his having obtained such possession by any false pretext which induced or deceived the owner into surrendering the possession to him; or, second, where he has obtained possession from the owner and at the time intends to deprive him of the value thereof and appropriate the property to his own use and benefit.   Either one of these modes of acquisition of property will separately constitute theft under our code.   (Hornbeck v. The State, 10 Texas Ct. App., 408.)

Now, in the case before us, the main, and indeed the only material question, is whether the facts shown in this record constitute theft.   It is in proof that all the money alleged to have been stolen was loaned by the prosecutor Tolan to the accused, upon his promise that he would return it or give it back to him when he had finished the game of cards which he and others were playing at the time the money was so loaned.

The court instructed the jury that, if they "believed from the evidence that the defendant and the three other parties jointly indicted with him entered into a conspiracy to fraudulently obtain from M. A. Tolan the possession of his money, with the intent, when such possession should be obtained, to deprive said Tolan of the value thereof, and appropriate the same to their own use and benefit, and that, acting together in pursuance of a common design to carry out such conspiracy, the said Porter, Wilson, Redding and Bagley, or either of them, represented to said Tolan that they desired his money for temporary use in a game in which they were then engaged, or about to engage, and that they would return him the same money they might receive from him when such game was ended, and that, upon such representation and promise, the said Tolan delivered to said parties, or either of them, the money described in the indictment for such temporary use in such game, and not intending to part with his title to the same, but understanding that he was to receive the same money back when such game should be ended, and that, when such representations and promise were made by said Porter, Wilson, Redding and Bagley, and when they so received said money from said Tolan, they did not

---

---

intend to comply therewith, but made the same for the purpose of getting possession of said money, with the fraudulent intent at that time, when such possession should be so obtained, to deprive the said Tolan of the value thereof and appropriate the same to their own use and benefit, and that the money so received by the said Porter, Wilson, Redding and Bagley was the same money described in the indictment (*e. g.*, describing it as it was described in the indictment), and that said money was the corporeal personal property of said M. A. Tolan, and was over the value of twenty dollars, and that after the possession of said money was so obtained by said Porter, Wilson, Redding and Bagley from said Tolan, the same was appropriated by them to their own use and benefit, without the consent of said Tolan and with intent to deprive him of the value thereof, you will find the defendant, William Porter, guilty of theft of property over the value of twenty dollars, as charged in the indictment, and assess his punishment," etc.

We are of opinion this instruction presented fully and accurately the law of the case in conformity with the spirit and intent of the statute. (Penal Code, art. 727; Dignowitty v. The State, 17 Texas, 521.) In the special instructions which were given, taken in connection with the main charge, the rights of appellant were carefully guarded as to every phase of his defense made by the evidence. Nor was it error to refuse the special instructions which the court declined to give.

This is a novel case of theft, but in our opinion a case of theft nevertheless clearly made out under the law and the evidence, as was found by the verdict and judgment of the lower court. We have found no reversible error in the record on this appeal, and the judgment is affirmed.

*Affirmed.*