LLOYD ELMON TISCHMACHER V. STATE.

No. 24403. May 25, 1949.
Rehearing Denied June 15, 1949.

*J. P. Moseley*, of Dallas, for appellant.

*Will R. Wilson, Jr.*, Criminal District Attorney, *George P. Blackburn*, First Assistant Criminal District Attorney, *Thomas C. Unis* and *Waller M. Collie, Jr.*, Assistants Criminal District Attorney, all of Dallas, and *Ernest S. Goens*, State's Attorney, of Austin, for the state.

BEAUCHAMP, Judge.

The appeal is from a conviction for murder, with a sentence of thirty-five years in the penitentiary.

On the night of February 19, 1948, the appellant and deceased, L. J. Dooley, together with Harold Smith, Juanita Perry, Mary Stevens and Bonnie Browning, left a drink place where one of the women was employed and went to the White Spot, another beer drinking place in the city of Dallas, and were engaged in drinking beer at tables pulled together. For some reason not revealed by the record, appellant became angry and left the party, seating himself at the bar. Some of the witnesses described him as being very angry. Both of the other two men went to appellant and tried to get him to rejoin the party. He came back to the table but continued to impress the party that he was very angry. They concluded that he was not going to take them back to town in his car, in which they had all gone to the White Spot, so one of the women ordered a taxi. About the time it arrived, Dooley walked out of the room. As he did so appellant turned and hit him, knocked him into a hedge in a sitting position. Appellant then grabbed Dooley by the head and pulled him over, at the same time taking from his pocket an instrument, which was described by one witness as a screw driver, and stabbed the deceased in the back of the neck several times. Juanita Perry tried to pull the deceased out of the reach of appellant, to stop the stabbing. At this, appellant struck at her with the screw driver. To avoid his striking her, Smith pushed Juanita Perry out of appellant's reach. While this was going on a bystander made a remark about what appellant was doing. This remark was admitted in evidence and is the ground for one of the bills of exception. Appellant left the scene and

ran around the building, taking with him the screw driver and leaving his automobile. He later called Thurman Bannister, the proprietor of the place, on the 'phone and asked if the parties had cleared out, and if "any laws" had come out there. He further said to Bannister, "I told you I would get even with some of them sons-of-bitches," and requested that Bannister make the statement to any inquiries that two or three jumped on him (appellant).

Dooley died before being removed from the spot. His wounds were described as being two in the back, two in the shoulders, one on the arm, one in the neck and one at the base of the skull. The mortician described them as having been made with a small blunt instrument. The one at the base of the skull showed that arteries were severed and was probably the fatal wound.

By Bills of Exception Numbers 1 and 2, contention is made that the evidence is insufficient to support the verdict in that the state did not show "the kind, quality and description of the screwdriver." Thurman Bannister testified in behalf of the state and, among other things, said that he saw appellant hit Dooley seven times; that he held him with one hand and was hitting with the other. We quote: "I saw the screwdriver in his hand. I believe it was a screwdriver. I would say the blade of the screwdriver was seven inches long." Mary Stevens tried to intercept Dooley to keep him from going out and said, "Jimmy has got a screwdriver in his pocket." Again, the witness Bannister said, "the first place that he hit him with the screwdriver was in the back of the neck." We think this evidence was sufficient to support the allegation relative to the instrument used. It was not necessary to describe the screw driver.

The second ground treated in appellant's brief upon which a reversal is sought is based upon the following described incident. The jury was completed at 6:15 in the afternoon. At this time the court announced that they would resume the trial of the case the next morning and the jury was retired to its room. He did not adjourn court for the day. At this point appellant, who was on bond, and his attorney left the room. Appellant says he left the building. His attorney was near the doorway, however, when he saw the jury brought back into the room and he returned to see what was taking place. He stood near the judge as he instructed the jury that they would be in charge of the bailiff; that they should not talk about the case until the evidence was in and arguments made; that they should not

separate; that they should not read a newspaper unless the bailiff had first deleted from it anything concerning the case on trial; and that they might communicate with their families to let them know where they were. No objection was made to this at the time and the court was not informed that the appellant had left the court room. The view is taken by appellant, in his brief, that this is a proceeding in his absence in violation of his constitutional right to be present at the trial of his case. The next mornng he appeared in court and filed a motion asking for a mistrial.

The statute involved has come before this court for discussion in many cases, of varying circumstances. We discuss but one case which we believe to be decisive of the question and we find nothing in our decisions that will support appellant's contention. *Cartwright v. State,* 259 *S. W.* 1085: The appellant was on trial on a charge of manufacturing intoxicating liquor, in violation of law. He had been arrested at the time of a raid on his place and the officers secured therefrom a jug containing some corn whisky. He plead not guilty to the charge. The state's evidence was introduced and, among other things, this jug with whatever it had in it was introduced in evidence. At the conclusion of the state's case appellant's attorney, by permission of the court, stepped into the witness room with his client. While they were absent from the court room an assistant district attorney picked up the jug and smelled it and passed it to some of the jurors who likewise examined it. The question was properly brought before this court. In the opinion by Judge Hawkins it was held that no injury resulted to him from the prosecutor's holding the jug and permitting some of the jurors to smell its contents. He then treats at length the various decisions on the subject supporting his holding that even though the question of the presence of the accused at his trial at all times is an important one, still a case will not be reversed unless some steps in the trial of the case vital to defendant's rights were taken in his absence. He quotes among other things from Powers v. State, 23 Tex. App. 42, 5 S. W. 153, the following: "But in any case, when a rule is invoked for non-observance, there should at least appear some slight reason why it should have been observed. It is a maxim that as a general thing, where the reason of a rule fails, the rule ceases to be obligatory or operative." The question is so thoroughly discussed in the Cartwright case that we do not feel it necessary to treat the subject further, unless there should be presented to us some later decisions of this court which might appear to be in conflict. We have found none. In writing on the motion for rehearing, Judge Lattimore said: "It

is not everything that takes place in the absence of a defendant upon trial for which a reversal should be ordered. There must be either an actual showing of injury or a showing of facts from which injury might reasonably be inferred." We think this expression is correct and find many authorities discussing various complaints in which this court has declined to reverse the case because of some steps taken in the absence of the party on trial.

· Appellant's third ground of complaint is a discussion on the weight of the evidence which was proper before the jury and not before this court.

By the fourth ground set out in appellant's brief, reliance is had on Bill of Exceptions No. 5 which complains of the admission in evidence of certain testimony given by Juanita Perry, which related to testimony given by her on a former occasion. In doing this it was revealed that the former occasion was a peace bond proceeding brought by her and her husband against appellant a few days after the killing. The proceeding by which this testimony was developed appears in the bill to some extent, but the origin of it is not given and we are unable to tell from the bill itself just what part of this testimony was objected to. The bill says: "The effect of the foregoing testimony was to get before the jury another and different transaction which reflected upon the Defendant's reputation and character, and thereby defendant was deprived of a fair and impartial trial." It is stated that these matters were called to the court's attention "by Defendant's amended motion for a new trial." While the proceedings copied in the bill contain some objections to the court's ruling, we are at a loss to determine just what part of it is presented as a basis for the above quoted complaint.

Appellant's fifth ground for reversal, based on Bill of Exceptions No. 6, relates to the remark made by Bannister, as a bystander, at the time appellant attempted to strike Juanita Perry as she was pulling the deceased away from him. He made the remark in the presence of appellant and others: "It looks like he is going to kill her too." It appears that this remark made at the very time the act was committed is admissible under the rule of res gestae. It sprang spontaneously from and shed light on the transaction taking place, as reflected by the mind of the witness at the very time the attack was being made on Dooley which resulted in his death. It was so closely connected in time and place that it may be regarded as part of the very transaction and illustrates the feelings, motives and acts of appellant while he was stabbing his victim. It reflects the impres-

sion he was making on Bannister, as a bystander, and interprets the intention of appellant in making the attack on Dooley. Fisher v. State, 272 S. W. 465; May v. State, 260 S. W. 873; Wharton v. State, 38 S. W. 2d 72; Kinney v. State, 144 S. W. 257; Dennis v. State, 2 S. W. 2d 223; Hall v. State, 275 S. W. 1047; Lowe v. State, 201 S. W. 986.

Appellant's Bill of Exception No. 7 complains of a statement made soon after appellant left the scene of the killing, about the condition of appellant's car and the prospect of his returning and driving away in it. We see no point in this evidence whatsoever. It appears to be immaterial and harmless.

Bills of Exception Numbers 8, 9, 10 and 11 relate to arguments made by the assistant district attorneys. These bills have been carefully considered by this court and we find no error pointed out by them.

Finding no reversible error, the judgment of the trial court is affirmed.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant has filed a motion for a rehearing herein, evidently not being satisfied with the disposition made in our original opinion of some of his complained of errors.

In this court we do not have numbered points nor assignments of error, unless such are based on bills of exception found in the record; nor is it sufficient to only mention a complained of error in the motion for a new trial unless same is based on the record, and usually called to the trial court's attention by an objection and exception. However, we do take cognizance of the evidence and would not hesitate to reverse if such evidence be not present.

Appellant's motion complains of our original opinion, especially in its treatment of Bill of Exception No. 4. In the first place, such bill contains the whole testimony of John C. Smith, a mortician, who is shown to be a licensed embalmer of 16 years' experience and embodies therein five pages, it being his entire testimony, to much of which no objection seems to have been urged. The trial court attempted to qualify such bill by setting forth only the testimony complained of and appellant's objection thereto. Not being satisfied with such qualification,

appellant excepted thereto, and the careful trial court thereupon filed his own bill embodying appellant's bill, together with the court's qualification, which is now Bill No. 4. We gather from this bill that appellant was endeavoring to bring to our attention the whole of the testimony relative to the condition of the body of the deceased in an effort to show that deceased may have met his death by means of being struck by appellant's fist and knocked down into a bush or flower bed. We do not agree with such contention. The testimony shows that the deceased was still living when he was lying in such bush; that he was endeavoring to arise when he was grasped by appellant upon the head and stabbed numerous times by a screw driver with a blade about seven inches long. It is a matter of common knowledge that a screw driver is an ordinary household utensil with a handle and a metal blade, which blade enters a nick in the head of a screw for the purpose of tightening or loosening such screw, and while the same may or may not be a deadly weapon per se, the mode and manner of its use can be utilized to determine its deadly character. See Ammann v. State, 145 Tex. Cr. R. 34, 165 S. W. (2d) 744.

It was shown by the evidence that deceased was living, when attacked by appellant with a screw driver as described, and that he died immediately after having been stabbed in the back of the body and head six or seven times, one of such stab wounds having penetrated at the base of the brain and evidently severing an artery.

There was no testimony concerning the cause of death being heart failure; it was not shown that deceased suffered from any heart ailment. There was testimony showing a vicious attack and several stab wounds in the back by appellant and the immediate death of the deceased. It would have been against all the evidence to say that he died from some heart affection where the testimony is present as to the actual cause of death. We think these wounds could be called serious ones, because he died immediately therefrom. This again disposes of Bill No. 4.

In Bill No. 5 we find that the state's witness was asked by appellant's attorney if she had not testified in this case before, and she answered that she had, and he then asked her some further questions relative to what she had testified to at such previous hearing. As a matter of fact, she had testified relative to this occurrence but not in this case before. The state then endeavored to straighten this matter out, and it was then shown that there had been a hearing relative to a peace bond. Appel-

lant brought this matter out himself, and we think the state had a right to go into the same from the state's standpoint under Article 728, Vernon's Ann. C. C. P.

We are cited to the case of Robeson v. State, 133 Tex. Cr. R. 407, 111 S. W. (2d) 725, as being in point herein. In that case it is shown that the state first went into the proposition of the accused being placed under a peace bond, which he was unable to make and for such failure he was confined in jail thereon. The accused objected to the introduction of such testimony, and from the opinion therein, it seems that such matter was not brought forth by accused's attorney, but was initiated by the state with no reason therefor other than to show that the accused had been confined on account of his inability to give such bond.

In the matter here present, appellant's attorney first inquired relative to the witness having given certain testimony at a previous hearing erroneously termed "of this case." The state then examined her as to the previous hearing "of this case" and developed the fact that such testimony was given concerning this same occurrence but that same related to a peace bond hearing relative to appellant being placed thereunder, and no result of such hearing was shown. We think that the case of Robeson v. State, supra, is not in point herein. See Vernon's Ann. Tex. C. C. P., Vol. 2, Art. 728, and annotations thereunder on page 1182. This matter being brought out by appellant, an explanation thereof could be offered by the state, even though it might bring forth damaging testimony against the accused. See Rosamond v. State, 101 Tex. Cr. R. 315, 276 S. W. 247.

Bill No. 7 relates to certain testimony concerning the taking out of appellant's car a certain part of the mechanism called a "rotor" in the absence of which the engine of an automobile would not run. This matter took place immediately after appellant had struck the deceased and had left the scene; being pursued a short distance in his flight, his pursuer then returning and immediately, within two or three minutes of the killing, removing such "rotor". This seems to be res gestae of the homicide, and in any event, we can see no harm resulting from a detail of such incident, especially so when taking into consideration appellant's proven conduct soon after the homicide.

Bill No. 8 relating to an argument of the state's attorney was properly overruled.

Bill No. 9 complaining of a certain argument wherein the state's attorney mentioned the fact of the deceased "leaving this poor woman a widow" as appealing to the prejudice of the jury. The trial court instructed the jury to disregard such argument, but appellant contends that the damage was so great that such instruction could not cure the same. The testimony is replete with many references to Mrs. Dooley, and she testified herein that she was the wife of Mr. L. J. Dooley; that he died on February 20, 1948, and evidently upon his death, she was left a widow. This bill, as well as Bill No. 10, was properly overruled, as was Bill No. 11. They were all properly passed upon in the original opinion.

We have written at length herein because of appellant's attorney's apparent dissatisfaction with the original opinion herein. However, this court is of the opinion that our holdings set forth in such original opinion were sound and proper and we adhere thereto.

Therefore, appellant's motion for rehearing will be overruled.