Harold G. DRAPER, Appellant,

v.

The STATE of Texas, Appellee.

No. 51127.

Court of Criminal Appeals of Texas.

July 19, 1976.

Jerry Mack Hyde, Tyler, for petitioner.

Curtis L. Owen, Dist. Atty., A. D. Clark, III, and George Conner, III, Asst. Dist. Attys., Tyler, for respondent.

Harry L. Williams, Fort Worth, for appellant.

Wiley L. Cheatham, Dist. Atty., Cuero, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for theft of property over the value of $200.00 and less than $10,000.00. After the jury returned a verdict of guilty, punishment was assessed by the court at ten years probated and a $1,000.00 fine.[1]

At the outset, appellant contends, "The trial court erred in overruling the appellant's Motion to Suppress evidence illegally acquired by the State."

Appellant's complaint is directed to the admission into evidence of an insurance application, a check written by a complaining witness to pay for a first quarter premium, and a "pitch sheet," all taken from appellant's briefcase, which he left in the Goliad County Sheriff's office in the early morning hours of September 5, 1974, the day after he had sold the insurance policy which gives rise to this prosecution.

The record reflects that Deputy Sheriff Mills had received reports that there were people in Goliad County purporting to sell insurance through the Agricultural Stabilization and Conservation Service, commonly referred to as the ASCS. Howard McRae, an investigator for the State Board of Insurance, came to Goliad County at the request of the sheriff's office. Arrangements were made for McRae to camp on land belonging to Garland and Sandra Hoff. After learning of McRae's occupation, the Hoffs told McRae about their purchase of an insurance policy from some ASCS men. As a result of this conversation, McRae advised Mills that he wanted to talk to appellant. Upon a check at the motel where appellant was staying, it was learned that appellant had gone to have "a few drinks." Appellant was located about mid-

night on his way back to Goliad from Victoria in the company of his cousin, one Terry Newsom. They were stopped by Texas Highway Patrolman Montgomery, who advised them that an investigator from the State Insurance Board wanted to talk to them and asked them to follow him to the courthouse. Appellant testified at the motion to suppress that he did not consider himself under arrest at this time. The testimony as to the events which ensued at the courthouse is in conflict. Appellant testified that he felt that he was in custody from the time he arrived at the courthouse until ". . . McRae said I was free to go." Appellant further testified that McRae threatened to file on Newsom for DWI and appellant for "drunk in public" if appellant didn't turn over to the officers the "insurance paraphernalia I had in my car." After appellant gave the officers his briefcase, he was allowed to return to his motel. No complaint was filed against appellant, and it was about five months before an indictment was returned against appellant.

McRae testified that appellant was never threatened in any way. According to McRae, appellant "contended that the insurance had been properly sold, he'd be glad to leave his sales material. . . . Mr. Draper [appellant] turned his briefcase and contents over to the deputy." It was agreed that appellant would come in the next day and discuss the matter. Appellant did not return the next day, nor did ever come back for his briefcase.

Mills testified that appellant "voluntarily turned them [briefcase and papers] over to us." Mills stated that appellant was never placed under arrest on the night in question and "was advised a number of times that he wasn't under arrest and that he could leave at any time." No warning of rights was given appellant.

The trial judge was the judge of the credibility of the witnesses and the facts on the motion to suppress. The testimony of

---

1. While no question is raised in this appeal regarding same, *Chudleigh v. State*, Tex.Cr.App., —— S.W.2d —— (1976) held that punish-

ment of ten years probated plus a fine is not violative of Art. 42.12, V.A.C.C.P.

the officers reflects that appellant voluntarily turned over his briefcase and its contents to the officers in an apparent effort to dispel suspicion. The court could reject all of appellant's testimony, as it apparently did, relative to threats being made to obtain the briefcase. The record does not support appellant's contention that he was in custody, but to the contrary reveals that he was only under suspicion. See *Heredia v. State*, Tex.Cr.App., 528 S.W.2d 847; *Brown v. State*, Tex.Cr.App., 475 S.W.2d 938.

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), where, as here, the party alleged to have given his consent was not advised that he had a right to refuse consent, the United States Supreme Court said:

"Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of [his] right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

■ We reject appellant's contention that a "Miranda warning" should have been given since appellant was not under arrest. Even if appellant had been under arrest, his consent would not have been vitiated provided it had been freely and voluntarily given. *Ribble v. State*, 503 S.W.2d 551. We find that the failure to advise appellant that he had a right to refuse to consent to search of his briefcase did not render his consent involuntary under the circumstances here presented.

No error is shown in the court overruling appellant's motion to suppress.

■ Appellant contends that the evidence is insufficient to support the conviction.

Appellant urges that, "to have obtained the check unlawfully from the alleged injured parties the appellant would have had to obtain the check without their 'effective consent' and with the 'intent to deprive,' and the intent to deprive had to exist at the time of the taking."

At the time of the commission of the instant offense, V.T.C.A. Penal Code, Sec. 31.03, "Theft," provided in pertinent part:

"(a) A person commits an offense if, with intent to deprive the owner of property:

\*　　\*　　\*　　\*　　\*　　\*

(2) he exercises control over[2] the property, other than real property, unlawfully.

(b) Obtaining or exercising control over[3] property is unlawful if:

(1) the actor obtains or exercises control over the property without the owner's effective consent; . . . ."

V.T.C.A. Penal Code, Sec. 31.01, "Definitions," provides in pertinent part:

"In this chapter:

\*　　\*　　\*　　\*　　\*　　\*

(2) 'Deception' means:

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

\*　　\*　　\*　　\*　　\*　　\*

(E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

(3) 'Deprive' means:

(A) to withhold property from the owner permanently or for so extended

---

**2.** Effective September 1, 1975, Secs. 31.03(a) and (b), and Sec. 31.01(5) were amended to speak in terms of "appropriation." The instant offense was committed September 4, 1974 and the law applicable is that effective January 1, 1974. See note under V.T.C.A. Penal Code, Sec. 1.07.

**3.** Id.

a period of time that a major portion of the value or enjoyment of the property is lost to the owner;

\* \* \* \* \* \*

(4) 'Effective consent' includes consent by a person legally authorized to act for the owner. Consent is not effective if:

(A) induced by deception or coercion;

\* \* \* \* \* \*

(6) 'Property' means:

\* \* \* \* \* \*

(C) a document, including money, that represents or embodies anything of value."

Appellant first attacks the sufficiency of the evidence to show a lack of effective consent. He urges that the State failed to prove any deception on his part within the meaning of Sec. 31.01(2)(A): creating or confirming a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true. Appellant states that,

"In attempting to make its case under this section the State tried to prove that the appellant told the alleged injured parties that the policy would cover three or four minor things which it did not actually cover, but by State's Exhibit No. 1 ["pitch sheet"] . . . shows that the matters which the alleged injured parties say were misrepresented to them were marked out on the material which he used to explain the policy to them."

The misrepresentations of policy coverage made by appellant can hardly be characterized as "minor." The Hoffs testified that appellant told them that the policy would cover 100% of expenses of each illness up to the maximum they selected. They testified that he told them that coverage of accidental injuries was immediate from their signing of the application, and that all other coverage was effective as soon as their family doctor returned to the company a card giving information on them. Additionally, they testified that appellant told them that doctor calls at home would be covered up to the maximum amount they selected.

Woody Pogue, Headquarter Section Manager of the Life Division of the State Insurance Board, testified that the accident and health policies of American Service Life Insurance Company (the company appellant purported to represent) approved for sale in Texas in fact covered only customary charges up to the maximum selected, not 100% of charges. He also testified that doctor calls at home were not covered, that the policies were effective only upon acceptance by the company regardless of the nature of the injury, and that surgical benefits were effective only after a 60 day waiting period. The Hoffs each testified that had they known any of these representations made by appellant to the contrary were incorrect, they would not have purchased the policy.

Appellant contends that the testimony that he made such representations is rebutted by the "pitch sheet" used by him to sell the policy. The "pitch sheet" [4] in the record

---

**4.** The following is a reduced copy of a 15¼ inch by 22 inch "pitch sheet" admitted into evidence as State's Exhibit No. 1:

# Texas Farmers and Ranchers
## MAJOR MEDICAL PLAN

### Special Enrollment

# $5,000⁰⁰

on each dread disease

Pays 100% of your HOSPITAL and DOCTOR BILLS up to

and your choice of up to  $500⁰⁰, $1,000⁰⁰, $2,500.⁰⁰, $5,000⁰⁰  for ordinary sickness or accident

## Choose a plan that meets your needs!

**HOSPITAL ROOM**....PAYS FULL CUSTOMARY CHARGES

**SURGICAL FEES**......PAYS FULL CUSTOMARY CHARGES

**DOCTORS CALLS**
In Hospital or Home ..............PAYS FULL CUSTOMARY CHARGES

**PRIVATE NURSING**
In Hospital or Home ..............PAYS FULL CUSTOMARY CHARGES

A.  Use Of Operating Room ..........PAYS FULL CUSTOMARY CHARGES
B.  Anesthesia ......................PAYS FULL CUSTOMARY CHARGES
C.  Use Of Cystoscopic Room ...........PAYS FULL CUSTOMARY CHARGES
D.  Hypodermics .....................PAYS FULL CUSTOMARY CHARGES
E.  Braces ..........................PAYS FULL CUSTOMARY CHARGES
F.  Casts And Splints .................PAYS FULL CUSTOMARY CHARGES
G.  Surgical Dressings ............. PAYS FULL CUSTOMARY CHARGES
H.  Surgical Trays .....................PAYS FULL CUSTOMARY CHARGES
I.  Oxygen .......................PAYS FULL CUSTOMARY CHARGES

J.  Medicines .....................PAYS FULL CUSTOMARY CHARGES
K.  X-Rays .........................PAYS FULL CUSTOMARY CHARGES
L.  Laboratory .....................PAYS FULL CUSTOMARY CHARGES
M.  Iron Lung ......................PAYS FULL CUSTOMARY CHARGES
N.  Basal Metabolism Tests ..............PAYS FULL CUSTOMARY CHARGES
O.  Electrocardiogram ..................PAYS FULL CUSTOMARY CHARGES
P.  Diathermy .......................PAYS FULL CUSTOMARY CHARGES
Q.  Radar Diathermy ...................PAYS FULL CUSTOMARY CHARGES
R.  Physiotherapy Treatment ...........PAYS FULL CUSTOMARY CHARGES
S.  Encephalogram ...................PAYS FULL CUSTOMARY CHARGES
T.  Lung Capacity Tests ...............PAYS FULL CUSTOMARY CHARGES
U.  Ultra Sound Treatments .............PAYS FULL CUSTOMARY CHARGES
V.  Cardiac Conversion Treatments ........PAYS FULL CUSTOMARY CHARGES
W.  Hydrotherapy ...................PAYS FULL CUSTOMARY CHARGES
X.  Pasteur Treatment For Hydrophobia ....PAYS FULL CUSTOMARY CHARGES
Y.  Blood Transfusions ...............PAYS FULL CUSTOMARY CHARGES

## TO TEXAS FARMERS AND RANCHERS;

For many years large companies have had the advantage of low cost group insurance giving high benefits, effective immediately.

Finally, this type coverage with Special Family Group Rates, is available to farmers and ranchers in Texas.

This Farmer and Rancher Plan pays all of your hospital and doctor bills, not half, not 80%, but every single penny you are charged up to the maximum amount selected by you.

We are all tired of individual policies that only pay part of the bill, if any at all, and constantly increase premiums, and finally, when you need it most; cancel out.

The Farmers and Ranchers Enrollment Period is limited.

Sincerely yours,

TEXAS FARMERS & RANCHERS PLAN

## PLUS:

INCLUDED IN POLICY AT NO EXTRA COST
Pays out patient care up to ....... $50.00
Pays Ambulance up to ......... $50.00

DOCTOR & HOSPITAL APPROVED

# COMPARE!

THE BENEFITS LISTED ON THIS SHEET WITH YOUR PRESENT POLICY, OR ANY OTHER POLICY

GUARANTEED RENEWABLE —.— NON–ALLOCATED —.— NON–DEDUCTIBLE

### TEXAS FARMERS and RANCHERS PLAN
### Box 551
### Ft. Worth, Texas 76101

PLEASE RUSH ME INFORMATION ON YOUR
COMPLETE COVERAGE POLICY!

NAME_____AGE_____
ADDRESS_____PHONE_____
RT._____BOX NO._____COMMUNITY_____
CITY_____COUNTY_____
I AM A FARMER_____RANCHER_____OTHER_____

# SPECIAL!

OUR PLANS ARE AVAILABLE WITH

# NO WAITING PERIODS

For any and all sickness, accidents and surgery. Why wait 6 or 12 months before you are covered for surgical benefits, heart trouble or any serious illness. Get coverage for any serious illness that may happen to you the day the policy is issued

Special Supplement

before us is a large sheet of paper outlining the benefits of the policy sold by appellant. Appellant points to several items on the sheet which are marked through.[5] On the sheet the $500 and $1,000 benefit maximums are marked out. They were not among the alleged misrepresentations and thus the markings rebut nothing. Also marked through are an "out patient care" benefit of $50.00 and an "ambulance" benefit of $50.00. Unless the out-patient care benefit relates to home doctor calls, these markings also rebut none of the alleged misrepresentations. If the out-patient care benefit is construed to cover home doctor calls, it was within the jury's discretion to believe the testimony of the Hoffs that appellant orally misrepresented this benefit to them and that they were deceived thereby. *Ables v. State,* Tex.Cr.App., 519 S.W.2d 464; *Belcher v. State,* Tex.Cr.App., 504 S.W.2d 858, 862.

We note that "full customary charges" is specified next to benefits A through Y on the pitch sheet. However, the pitch sheet also states, "Pays 100% of your HOSPITAL and DOCTOR BILLS" up to stated maximums, and elsewhere, "This Farmer and Rancher Plan pays all of your hospital and doctor bills, not half, not 80%, but every single penny you are charged up to the maximum amount selected by you." The contradictory nature of these statements on the sheet lends credence to the Hoffs' testimony that appellant told them 100% of their expenses would be paid, rather than just the charges customary in the locale. See *Ables v. State,* supra; *Belcher v. State,* supra.

Both the Hoffs testified that appellant represented to them that he was selling the insurance policy through the Agriculture Stabilization and Conservation Service, an agency of the federal government, and that the policy was a "special enrollment" type for farmers and ranchers. State Board of Insurance representative Pogue testified that the "special enrollment plan" designation had been prohibited by their agency as

misleading in that it implies group insurance and this is not a group insurance policy. A representative of the Agricultural Stabilization and Conservation Service, Marshall McDonald, testified that no insurance company was in any way affiliated with or authorized to sell insurance through their agency. Both complaining witnesses testified that they would not have bought the policy had they known these representations were not true. This evidence is clearly sufficient to show deception, vitiating effective consent.

Appellant argues that the deception proved here to vitiate the effective consent of the complaining witnesses would have to be characterized as a false promise to perform under Sec. 31.01(2)(E), rather than as a false impression of fact under Sec. 31.01(2)(A). We find that the misrepresentations made here may be properly characterized either way: as a false impression of fact (that the appellant was selling through the ASCS, and that the policy contained coverage it did not), or as a false promise to perform (that appellant would deliver a policy in some way associated with the ASCS, containing the coverage he described). Since as shown above the evidence was sufficient to show false impressions of fact within the meaning of V.T.C.A. Penal Code, Sec. 31.01(2)(A), there was no effective consent.

If the false representations of appellant be characterized as promises to perform which he did not intend to perform or knew would not be performed [under V.T.C.A. Penal Code, Sec. 31.01(2)(E)], the evidence is nonetheless sufficient. Appellant argues that he,

> "was prevented from delivering the policy because some twelve hours after taking the application of the alleged injured parties for the policy and receiving their check for the same the officers arrested the appellant and took from him the application and the check and prevented him from being able to deliver the policy.

---

5. Mrs. Hoff testified that she could not remember whether the markings were on the "pitch sheet" at the time appellant sold the policy to her and her husband.

The appellant's intent to perform is shown by the fact that he left a receipt for the check showing that a policy would be delivered if approved by the company and if not approved their money would be refunded."

The fact that appellant surrendered the check and application to officers serves only to explain why an accident and health insurance policy of *some description* was never delivered to the complaining witnesses. Likewise, the receipt left by appellant shows only an intent to deliver an insurance policy of *some description*, and it is some evidence to rebut the Hoffs' testimony that appellant told them there would be no waiting period for the policy. Neither of these facts is evidence that appellant intended to deliver an insurance policy *as promised*: special enrollment type, sold through the ASCS, covering 100% of any expenses up to a maximum, with no 60 day surgery benefit waiting period, and with immediate accidental injury coverage.

Appellant points to Sec. 31.01(2)(E), supra, which provides:

"failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed."

Appellant urges that there is no evidence that he did not intend to perform his promises or that he knew they would not be performed other than his failure to perform, which was not his fault.

There are no cases treating this question under the new theft statute. However, we do have cases dealing with this question which arose under Art. 1413, V.A.P.C. Both appellant and the State agree, and we think correctly, that under our former Penal Code appellant would have been prosecuted for theft by false pretext.

"The offense of theft by false pretext is [1] the obtaining of possession of property [2] by a willing surrender of the owner [3] induced to deliver such possession by false pretext or device [4] and with the fraudulent intent of accused, at the time he came into possession of the property,

to appropriate it to his own use, [5] followed by such appropriation. *Maxwell v. State*, 134 Tex.Cr.R. 314, 115 S.W.2d 939."

Except for the elimination of the element of actual appropriation of the property, see V.T.C.A. Penal Code, Secs. 31.03, 31.01, the offense consisted of essentially the same elements as the theft charged here. It included the element of knowledge on the part of the actor that the pretext was false. Cf. *Thornton v. State*, 171 Tex.Cr.R. 565, 352 S.W.2d 742. Thus the cases involving theft by false pretext may be relied upon for guidance in reviewing the sufficiency of the evidence to show that the actor knew the statements of fact made by him were false, or that he did not intend to perform the promises made by him or knew that they would not be performed.

In *Colaluca v. State*, 494 S.W.2d 885, the defendant there sold two watches for $20.00 apiece. Each watch had a tag attached which said "150.00." The complaining witnesses testified he told them the watches were electric and normally very expensive but that he needed money to return to New York. The defendant testified that the "150.00" tags were simply decoration, that all jewelers used such tags, that he only said the watches were "Kronation Electras," and that he only said he needed money. The watches were shown to be standard spring wound watches worth only $5 to $7. The evidence was held sufficient to sustain a conviction for theft by false pretext.

In *Scott v. State*, Tex.Cr.App., 450 S.W.2d 868, the defendant induced a woman to let him check the lightning rods on her house for $400 by telling her that her adult grandson had said she should let defendant. Defendant had been to the grandson's house and had checked the lightning rods, but he made no such recommendation. The evidence was held sufficient to show theft by false pretext.

In the instant case, there was evidence that appellant falsely represented to the Hoffs that he was selling his policy through the ASCS, a government agency. He false-

ly represented that the policy was a "special enrollment" policy for farmers and ranchers when in fact anyone could buy it; "special enrollment" is a term prohibited by the State Board of Insurance as misleading. He stated that the American Service Life policy he was selling would have 100% coverage and no waiting periods. As in *Colaluca*, appellant had merchandise to sell, but it was not what he said it was. As in *Scott*, appellant claimed that he was recommended and backed up by someone who had not so endorsed him. We find the evidence sufficient to show that he knew the delivery of an insurance policy as promised would not be performed. Cf. *Bearden v. State*, Tex.Cr.App., 487 S.W.2d 739; *Kinder v. State*, Tex.Cr.App., 477 S.W.2d 584.

Appellant next claims that the evidence was insufficient to prove an intent to deprive as required by V.T.C.A. Penal Code, Sec. 31.03(a). V.T.C.A. Penal Code, Sec. 31.01(3)(A) applies here. It defines "deprive":

> "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner."

Appellant points out that the practice commentary to Sec. 31.03, supra, states that a temporary withholding is not such a deprivation as will support a conviction for theft. He then argues that his 12-hour possession of the Hoffs' check is such a temporary deprivation. Appellant misconstrues the meaning of the theft statute and the practice commentary. Section 31.03, supra, does not require an actual deprivation of property, but only an *intent* to deprive. The remark in the practice commentary to Sec. 31.03 must be understood in light of the fact that in theft cases the intent to deprive is often proven by an actual deprivation. In such cases, the temporary use of someone's property, standing alone, would not normally be sufficient proof of an intent to deprive permanently. It does not follow, however, that a deprivation of property that is temporary automatically disproves an *intent* to deprive perma-

nently or for so long that a major portion of the value or enjoyment of the property is lost to the owner.

*Enright v. State*, Tex.Cr.App., 513 S.W.2d 581, cited by appellant, held that it was not conversion by bailee for a mechanic to withhold an automobile from its owner for about 40 days pending settlement of a dispute over a release of civil liability for work done on the car. The owner would not sign the release, and the mechanic would not accept payment and turn over the car without it. The Court rested its decision on the State's failure to show an intent to permanently deprive the owner of the automobile. The Court commented that,

> "Though the temporary deprivation was wrongful, it was not such conduct as is prohibited by Article 1429 [V.A.P.C.]. Rather it was a matter of dispute amenable to adjudication in the civil courts. The evidence here is insufficient, upon the whole record, to support a finding of guilt within the meaning of Article 1429, § 1."

Appellant urges that the present appeal presents a simple civil dispute and not a case of theft, and he urges that the rationale of *Enright* be applied. In *Enright* the evidence clearly showed that the mechanic intended only to hold the car until he received the release of liability. This was not an intent to deprive permanently, even though the mechanic had no right to hold the automobile. In the instant case the evidence, looking to the whole record as in *Enright*, shows an intent to deprive permanently. Appellant did not take the stand, nor did he offer any evidence at the guilt stage of the trial. Mr. and Mrs. Hoff testified that appellant took from them an application for an accident and health insurance policy with American Service Life Insurance Company and a check for $251.30 in payment therefor. There was no evidence and no contention by appellant that the transaction was made in jest or that the money was borrowed. On the contrary, the uncontradicted evidence shows that appellant took the money to pay for the insurance policy he sold the Hoffs, and there is

no evidence that he had any intention to return the check voluntarily. Cf. *Daley v. State*, Tex.Cr.App., 491 S.W.2d 932; *Scott v. State*, supra; *Reeves v. State*, Tex.Cr. App., 428 S.W.2d 320; *Dennis v. State*, Tex. Cr.App., 420 S.W.2d 940; *Hilliard v. State*, Tex.Cr.App., 401 S.W.2d 814, cert. denied 385 U.S. 941, 87 S.Ct. 310, 17 L.Ed.2d 220.

Appellant cites V.A.T.S., Insurance Code, Art. 3.70–2(A)(8), providing an insurance company is required to allow an applicant ten days to return the policy and receive a full refund of money for any reason whatsoever.

The only element of the offense which appellant seems to suggest is negated by the ten-day return statute is the intent to deprive permanently or for so long that a major portion of the value of the property is lost to the owner. Appellant's brief states that,

> "had he been let alone the company would have issued a policy which the parties could have accepted or refused and got their money back with no damage done to anyone."

It does not negate intent to deprive to say that the Hoffs could have gotten their money back. As the State points out, the offense of theft has long been held to be complete when the property is obtained, if the other elements are present. See cases collated under 5 Branch's Annotated Penal Code Supp., Sec. 2678.

Section 31.03, supra, makes the offense of theft complete upon a showing that appellant exercised control over the property by means of knowing false statements of fact or knowing false promises with intent to deprive the owners of the property permanently or for so long that a major portion of the value or the enjoyment of it is lost to them. Appellant completed the offense of theft when he obtained the check if he intended at that time to keep the check. The undisputed evidence shows that he did. The fact that a state statute requires the insurance company to return the Hoffs' money if they discover his deception within ten days of receipt of the policy in no way bears on the nature of appellant's intent.

We hold the evidence to be sufficient to show the necessary intent to deprive and conclude that the evidence was sufficient to support the conviction.

The judgment is affirmed.

Opinion approved by the Court.