

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-16-00190-CR

_____


CHRISTIE ZIMMERMAN KISSINGER, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CR-15-25667


Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

After Judy Kissinger (Judy) discovered that $2,000.00 was missing from her savings account, her daughter-in-law, Christie Zimmerman Kissinger (Christie), admitted to several people that she had taken the money. As a result, Christie was convicted by a Fannin County jury of theft of property from an elderly person and was assessed a punishment of four years' imprisonment and a fine of $5,000.00. On appeal, Christie complains that the evidence was insufficient to support her conviction. Since we find that there is sufficient evidence to support the conviction, we will affirm the trial court's judgment.

## I. The Evidence at Trial

Testimony at trial showed that Judy, who was sixty-nine years old at the time, discovered that someone had transferred $2,000.00 from her savings account without her permission. After her discovery, Judy told her son, Jeff, about the missing money. Jeff called his brother, J.D., who had access to Judy's accounts, to find out if he knew anything about the money. J.D. did not know anything about it, but gave the telephone to his wife, Christie. Christie told Jeff she had taken the money out of Judy's account and that she was hoping to put it back when she got paid and before Judy found out. When he asked her why she took the money, Jeff received no response.

After her conversation with Jeff, Christie initially told J.D. that the missing money was a banking error and identified a person at the bank who had made the error. She then called Judy and told her that it was a banking error. However, when Judy asked her how this happened, Christie told her, "Well, I did it at home," and that "it was just sitting there." Some days later, Christie also admitted to J.D. that she had taken the money. About a month later, Christie gave

2

J.D. $2,000.00 to give to Judy, which he did. Judy also testified that she did not give Christie permission to take money from her savings account.

The evidence also showed that Judy had opened her checking account at the First National Bank of Trenton (First National) in 1978 with her now deceased husband, Don. After Don died, Judy added J.D.'s name to this account in March 2010. Judy and Don also had a different savings account at First National. Judy also added J.D. to her savings account in 2010 after Don's death. Both Judy and J.D. testified that all of the money in Judy's accounts was hers and that J.D. had never deposited any money into, or withdrawn any money out of, the accounts. Both also testified that although J.D. had online access to Judy's accounts, he never accessed them.

The evidence also showed J.D. married Christie in August 2012 and that he added her to his checking account in December 2012. J.D. testified that after Christie was added to his account, he gave his log-in information to Christie to access their joint account online. Kathy Lance, the chief operating officer at First National, testified that anyone using his log-in information could access all accounts associated with J.D. and could transfer money between the accounts online. These accounts included J.D. and Christie's joint account (the Joint Account), J.D.'s individual retirement accounts, Judy's accounts, and two savings accounts of J.D.'s children, Alaina and Dillan. Bank records showed that $1,000.00 was transferred from Judy's savings account to the Joint Account on both November 26 and December 9, 2014; $400.00, each, was transferred from Alaina's and Dillan's savings accounts to the Joint Account on November 20, 2014; and $200.00 was transferred from Dillan's savings account to the Joint Account on November 26, 2014. J.D. testified that Christie made these transfers, and he denied giving her permission to access or take

money out of Judy's account. J.D. also testified that Christie was in charge of the couple's banking and finances when they were together. He said that he had over $30,000.00 in his bank account when they were first married and that by the end of 2014, he was broke.

In addition, the evidence showed that Christie owned a Choctaw Platinum Diamond Card (Christie's Card) from the Choctaw Casino (the Casino) in Durant, Oklahoma. According to the Casino's records, Christie's Card was used on 129 days in 2013 and sustained a total loss of $32,539.10. In 2014, Christie's Card was used on 162 days and sustained a total loss of $41,632.13. J.D testified that he had accompanied Christie to the Casino only ten to twelve times over these two years and that he had never used Christie's Card. He said that he did not learn about how often Christie was going to the Casino until after he filed for a divorce in February 2015. Christie's daughter, Mary Shearer, testified on Christie's behalf that she used Christie's Card when she went to the Casino, as did J.D. She also testified that she had her own card that was on Christie's account. Mary said that before she began working, she sometimes went to the Casino once or twice a week, and after that, she might go on the weekends.

Suzanne and Darran Dyer, Christie's sister and brother-in-law, also testified on her behalf. Darran testified regarding a conversation between Suzanne and J.D. in which J.D. told her that things were awkward between Christie and J.D.'s family because Christie transferred some money that she thought was from J.D.'s account, but it was from his mother's. Suzanne testified that J.D. told her that he had asked Christie to transfer some money from an account. They also testified that J.D. told Suzanne that it was just a misunderstanding and that they repaid it. Suzanne also

4

testified that Christie did not gamble before she began a relationship with J.D. and that J.D. said he took full responsibility for her gambling.

## II.     Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In drawing reasonable inferences, the jury "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). Further, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of a witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App.

2014). We give "almost complete deference to a jury's decision when that decision is based on an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

## III. Analysis

In her sole issue, Christie challenges the legal sufficiency of the evidence supporting her conviction. Under the statute and the indictment, to obtain a conviction, the State was required to show beyond a reasonable doubt that Christie, on or about December 9, 2014, (1) unlawfully

6

appropriated (2) cash in an amount of at least $1,500.00, but less than $20,000.00, (3) from Judy, (4) who was an elderly individual, (5) without the effective consent of the owner, and (6) with intent to deprive the owner of the property. *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(4)(A), (f)(3)(A) (West Supp. 2016).[1] Christie only challenges the sufficiency of the evidence showing (1) that she did not have the effective consent of the owner and (2) that she intended to deprive the owner of the property.[2] Under the statute, "'[e]ffective consent' includes consent by a person legally authorized to act for the owner." TEX. PENAL CODE ANN. § 31.01(3) (West Supp. 2016). "Deprive" means "to withhold property from the owner permanently or for so extended period of time that a major portion of the value or enjoyment of the property is lost to the owner." TEX. PENAL CODE ANN. § 31.01(2)(A) (West Supp. 2016).

Christie argues that the evidence shows that J.D. was a co-owner of Judy's savings account, that it is presumed that the money in Judy's account was the community property of J.D. and Christie, and that she either had the effective consent of J.D. to withdraw the funds to pay the couple's bills, or that she was legally authorized to act on J.D.'s behalf as his wife since it was their community property. Therefore, she argues, she had the effective consent of J.D. Christie does not contend that she had Judy's effective consent.

However, the evidence at trial established that the funds in Judy's savings account were hers alone. The evidence showed that the savings account was established sometime prior to 2010

---

[1]At the time of the commission of the offense, the value range under subsection (e)(4)(A) of Section 31.03 was "$1,500 or more but less than $20,000." *See* Act of May 27, 2011, 82d Leg., R.S., ch. 1234, § 21, 2011 Tex. Gen. Laws 3302, 3311 (amended 2015) (current version at TEX. PENAL CODE § 31.03(e)(4)(A)).

[2]Our review of the record shows that sufficient evidence supports the jury's findings regarding the unchallenged elements of the State's case.

7

by Judy and her husband, Don. The testimony also showed that J.D. was "added to" the savings account in 2010, after Don's death. Although the record contains a signature card showing J.D. as a co-signatory on Judy's checking account, no signature card for Judy's savings account appears in the record. Therefore, it is unclear whether J.D. had any authority to withdraw funds from the savings account. Further, the undisputed testimony was that all of the funds in Judy's savings account were hers and that J.D. had never deposited any funds into it. Finally, although J.D. testified that he gave Christie his log-in information in order to access the Joint Account, he testified that he never gave her permission to access Judy's savings account or to withdraw funds from it. Although Suzanne testified that J.D. told her he asked Christie to withdraw the funds, the jury, as sole judges of the credibility of the witnesses, could have chosen to not believe her testimony. Judy also testified that she did not consent to Christie taking money from her savings account. On this evidence, a reasonable jury could find that Judy was the sole owner[3] of her savings account and of the funds contained in it and that Christie did not have Judy's consent to withdraw money from the savings account. Further, based on this evidence, a reasonable jury could find that even if J.D. was authorized by Judy to withdraw funds from the savings account, he did not consent to Christie doing so. We find sufficient evidence to support the jury's implied finding that Christie did not have the effective consent of the owner to withdraw the funds.

Christie also argues that the evidence shows that Christie's withdrawal of the funds was a misunderstanding and that, at most, it shows that Christie was only borrowing the money for a

---

[3]A corollary of this finding would be that J.D. was not an owner of the savings account or any of the funds contained in it and that he never possessed the funds. Since J.D. did not own or possess the funds in the savings account, any community presumption would not apply. *See* TEX. FAM. CODE ANN. § 3.003(a) (West 2006).

short time. Thus, she reasons, the evidence does not show a permanent or extended time of withholding of the property from the owner.[4]

The relevant element of theft that Christie challenges by this argument is her intent to deprive the owner of the property. *See Griffin v. State*, 614 S.W.2d 155, 158 (Tex. Crim. App. [Panel Op.] 1981). "Intent to deprive must be determined from the words and acts of the accused." *Id.* at 159 (citing *Banks v. State*, 471 S.W.2d 811, 812 (Tex. Crim. App. 1971)). The relevant inquiry is whether the defendant intended, at the time of the taking, to deprive the owner of her property. *Wilson v. State*, 663 S.W.2d 834, 836–37 (Tex. Crim. App. 1984) (citing *Peterson v. State*, 645 S.W.2d 807, 811 (Tex. Crim. App. 1983)); *see Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012). "The fact that the deprivation later became temporary does not automatically mean that there was no intent to deprive permanently or for so long as to satisfy the statutory definition." *Griffin*, 614 S.W.2d at 159 (citing *Draper v. State*, 539 S.W.2d 61, 68 (Tex. Crim. App. 1976)). "Proof of a culpable mental state is often made by circumstantial evidence." *Louis v. State*, 329 S.W.3d 260, 268 (Tex. App.—Texarkana 2010), *aff'd*, 393 S.W.3d 246 (Tex. Crim. App. 2012) (citing *Dunn v. State*, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.)). Intent may be inferred "from any facts which tend to prove its existence, including the acts, words, conduct of the accused, and the method of committing the crime." *Id.* (citing *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002)). Further, in a theft prosecution, evidence that the

---

[4]Christie also argues that there was no depriving of property at all since the funds were deposited in the Joint Account. However, this argument is based on the presumption that J.D. was a co-owner of the funds. In our prior discussion, we have determined that a reasonable jury could have found that Judy was the sole owner of the funds.

defendant participated in recent transactions similar to the transactions on which the prosecution is based is relevant to show intent. *See* TEX. PENAL CODE ANN. § 31.03(c)(1).

The evidence showed that during the two years before she withdrew funds from Judy's savings account, Christie had incurred tens of thousands of dollars in gambling losses. In addition, she had depleted over $30,000.00 in the Joint Account. During this time, she apparently hid both the extent of her gambling and the extent of her losses from J.D. Further, before withdrawing the funds, she did not ask permission from Judy or J.D. After taking the money, she did not tell anyone. Only when confronted by Jeff did she admit that she took the money and claim that she intended to repay it. Even after being confronted, she initially told both Judy and J.D. that it was a banking error. Only later did she admit that she took it and explain to Judy that the money "was just sitting there." Also, the evidence showed that shortly before she took $2,000.00 from Judy's savings account, Christie took $400.00 from Alaina's savings account and $600.00 from Dillan's savings account. Based on this evidence, a reasonable jury could find that at the time of the taking, Christie intended to deprive Judy of her funds. We find that sufficient evidence supports this implied finding of the jury.

Having found that sufficient evidence supports Christie's theft conviction, we overrule her sole issue on appeal.

For the reasons stated, we affirm the judgment of the trial court.



Bailey C. Moseley
Justice

Date Submitted:     September 27, 2017
Date Decided:      September 29, 2017

Do Not Publish