**Marvin McCLURE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 62125.**

Court of Criminal Appeals of Texas, Panel No. 2.

July 14, 1982.

On Rehearing En Banc March 9, 1983.

Rehearing Denied April 13, 1983.

Art Brender, Fort Worth (Court-appointed), for appellant.

Tim Curry, Dist. Atty., William Kane, Travis Young and Bill Lane, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before DALLY, W.C. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This case became a *cause celebre* in the Dallas-Fort Worth area long before it reached this Court—a notoriety of which we were unaware during oral argument on original submission,[1] but which is now revealed in matters *dehors* the record that are rife with improprieties.[2] Our decision, however, is based upon the review circumscribed by Article 40.09, § 13,[3] V.A.C.C.P.,

---

1. There was, though, a hint when the appellate attorney for the State acknowledged that this prosecution, arising out of an underlying dispute over a sales agreement, was based on the desire "to get this guy off the streets."

2. Some of these or similar materials did find their way into the transcript prepared by the clerk of the trial court. Suffice it to say they reflect determined, if eccentric and unorthodox, efforts by appellant and his sympathizers.

3. In pertinent part, Section 13 provides that "the clerk shall thereupon promptly transmit the record and briefs to the Court of Criminal Appeals, in which court all grounds of error

and no more; see cases annotated in notes 704, 705.

The appeal is from a conviction for the offense of theft over two hundred dollars, a jury having found appellant guilty, and punishment assessed at confinement for life, pursuant to V.T.C.A. Penal Code, § 12.42(d), the trial court having found that two enhancement paragraphs were true.[4] Such punishment has been held to be neither cruel or unusual in *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

The theft at issue is alleged to have been committed "on or about the 11th day of August 1977," and the proof presented by the State to support the allegation shows two orders placed with appellant on August 11 and 15, 1977. Omitting its formal parts and enhancement paragraphs, the indictment avers that appellant did:

"... knowingly and intentionally appropriate property, other than real property ... from the owner ... without the effective consent of the owner and with intent to deprive the owner of the property."

In its charge to the jury the trial court abstractly instructed, *inter alia;*

"Our law provides that a person commits the offense of theft if he unlawfully appropriates property with intent to deprive[5] the owner of property. Appropriation of property is unlawful if it is without the owner's effective consent."[6]

and in applying the law to facts the charge substantially tracks the language of the indictment. Appellant expressly had no objection to the charge. The verdict of the jury finds appellant guilty "as charged in the Indictment."

The indictment, the charge of the court and the verdict that relates back to the indictment are derived from the following portions of V.T.C.A. Penal Code, § 31.03:

"(a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.

(b) Appropriation of property is unlawful if:

(1) it is without the owner's effective consent; ..."

As applicable here, § 31.01(5) provides:

"(5) 'Appropriate' means:

(A) * * *

(B) to acquire or otherwise exercise control over property other than real property."

And § 31.01(6) provides:

"(6) 'Property' means:

(A) * * *

(B) * * *

(C) a document, including money, that represents or embodies anything of value."

According to § 31.01(2), there are five manners of perpetrating "deception." While the indictment did not allege one or another means of deception, we take it from, e.g., *Hughes v. State,* 561 S.W.2d 8 (Tex.Cr.App.1978), that it need not, and any

---

and argument in support thereof urged in defendant's brief in the trial court shall be reviewed, as well as any unassigned *error* which in the opinion of the Court of Criminal Appeals should be reviewed in the interest of justice." (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

**4.** In 1957 appellant was convicted of the federal offense of having uttered and published as true two forged U.S. Treasury checks, each in the sum of $110. In 1972 a district court in Colorado convicted him of forging a check in an amount not reflected in the papers.

**5.** The meaning of "deprive," set out in V.T.C.A. Penal Code, § 31.01(3), was defined for the jury as "to withhold property from the owner

permanently or to dispose of property in a manner that makes recovery of the property by the owner unlikely or to withhold property from the owner for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner."

**6.** Abstractly also the charge defined "effective consent" to mean "assent in fact, whether expressed or apparent ..." and added that consent is not effective "if induced by deception or coercion." Though fully defined by V.T.C.A. Penal Code, § 31.01(2), neither one of the five modes was included in the charge; thus, we do not know just what the jury had in mind was the deception at work here.

defect of notice in that respect must be raised by timely motion or exception, *Trevino v. State,* 519 S.W.2d 864, 866 (Tex.Cr. App.1975) and *Hughes v. State,* supra. Similarly, it is necessary to charge the jury on all essential elements of the offense alleged, *Bradley v. State,* 560 S.W.2d 650, 652 (Tex.Cr.App.1978), but if the accused desires and is entitled to findings beyond those elements he must object and except to their omission or request a special charge incorporating them, Articles 36.14 and 36.-15, V.A.C.C.P., to call the trial court's attention to them, e.g., *Crawford v. State,* 148 Tex.Cr.R. 634, 190 S.W.2d 359, 361 (1945) and see *Martinez v. State,* 576 S.W.2d 854, 855 (Tex.Cr.App.1979) and *Hanner v. State,* 572 S.W.2d 702, 707 (Tex.Cr.App.1978).

As already indicated, appellant voiced no objection to the charge. Thus, we are without a specific allegation or a particularized finding of the manner of deception thought to have perpetrated on the complaining party by appellant.

Moreover, as we read the briefs of the competing parties they seem to mix indiscriminately concepts of specific intent to deprive of property and of consent induced by deception which renders appropriation of property unlawful under § 31.03(a) and (b)(1), respectively, so that we are not appreciably aided in discerning the precise legal theory on which this case was tried. The challenge appellant makes to sufficiency of the evidence to prove the element of specific intent to deprive of property and to show any ingredient of deception to induce consent does give us much pause, but there are in the record unassigned errors that must be considered in the interest of justice. For this we first sketch a background

from evidence that, unlike inferences to be drawn, is not sharply disputed.

The publisher of the "Federal Round-up," a monthly inhouse publication for federal employees in and around the Fort Worth area, first met appellant in February 1977. He placed and paid for an advertisement in the name of American International Ombudsman and Associates (American International). It was one of several enterprises in whose name appellant was then doing business.[7] American International sold at discount prices a variety of merchandise from calculators to coffee. Thereafter ads were run and paid for monthly. Mrs. Black, the publisher, purchased different items from time to time, and she professed to know hundreds of other persons to whom he sold and delivered goods. Beginning in 1976, one who dealt with appellant is Otis Hatfield, the complaining party. He had purchased a calculator and "it worked."

In July or August 1977 appellant advertised guns for sale, as well as his regular line of products. Hatfield saw the ad and responded by telephone, ordering coffee and a shooters' bible, evidently an annually published trade journal of weapons manufacturers, which appellant delivered in person. They fell into a conversation about buying guns shown in the shooters' bible; since the State says that Hatfield was induced by deception to part with his purchase money for guns, Hatfield's version of the critical portions of that conversation are reproduced verbatim:

> "A. Well, I asked him if I could buy guns out of this shooters' bible and he told me he could get the guns for dealer's cost plus the—I had to pay the cost and the associated fees, state tax, federal tax, I believe, and what have you.

7. In the assumed name register in the office of the Tarrant County clerk, see former Articles 5924 and 5926, V.A.C.S., and V.T.C.A. Business and Commerce Code, Ch. 36, appellant was shown as doing business as American International and as Metroplex Gun Distributors; he also operated a business under the name "World Marketing." In this connection, over proper objections, the trial court admitted a certificate from the Secretary of State that there was no record to indicate existence of a *corporation* named American International &

Associates and permitted the prosecutor to argue that "it's not registered with the Secretary of State." Yet a sole proprietorship is not a corporation, and, as such, need not be on file with the Secretary of State—only the county clerk, as was done here by appellant. To imply, as the State was permitted to do, that appellant was conducting his enterprises without complying with some legal requirement was manifestly erroneous and clearly calculated to harm him.

I asked Mr. McClure if he had a federal firearms license number and he said he did not but that his company did which was—

Q. What is the name of his company?

A. I *believe* he said he was American International Associates, Inc.

Q. Did he say who he dealt with in order to obtain the guns?

A. Yes, he said that he *would be* dealing with various manufacturers representatives or at least a jobber with the factory themselves.

Q. So, he indicated to you that he did deal directly with the factory or manufacturers?

A. He *could,* yes."

Hatfield did not order a firearm that day, but he took the shooters' bible home to "shop more or less;" though he liked to read the "bible" he had not yet read the 1977 edition.

In early August Hatfield called appellant and told of his interest in purchasing a specified Smith & Wesson .22 caliber target pistol, and appellant quoted him a price. August 11, 1977 at Hatfield's office appellant presented an invoice for the pistol and received Hatfield's personal check in the amount of $168.50, telling him delivery would probably be in about three weeks. They also discussed what Hatfield, himself a gun aficionado, already knew: that the price of guns was going up and if, one is successful in selecting them, guns are a good investment.[8] Later, musing over this proposition, Hatfield decided to purchase still more weapons; he contacted appellant, ordered four Smith & Wesson revolvers, a Marlin bolt action rifle and a Galef 12

gauge shotgun, and on August 15, 1977 received invoices for them and delivered to appellant a personal check in the amount of $749.05—the total orders thus aggregating $917.55. The retail price for the lot was $1,085.20, according to copies of invoices left with Hatfield.

In about three weeks, having not received the weapons, Hatfield contacted appellant by phone to find out "if there had been any progress made in getting the guns or ... what the status was on the order." Appellant reported:

"That he had not been able to get the guns yet. . . . [He] said that he had tried out with—he was trying to meet with Jess Stockstill out of Grapevine and they wouldn't—he didn't buy from Jess Stockstill because they wanted to sell him a case of ammunition with each of the guns he wanted to purchase from them." [9]

Appellant also mentioned that the domestic delivery schedule of Smith & Wesson guns was running late because a minimum amount of them were available to the American public since the OPEC nations were buying a bunch of them—to Hatfield it was "a fairly standard rumor-type thing." [10] As well as Stockstill, appellant said he had tried some other source, but Hatfield did not recall if appellant named the second source.

In our record is a copy of a completed order form describing each weapon invoiced to Hatfield and bearing the purported signature of appellant. The date does not appear because it is obvious that the copy paper and the original form were not

---

**8.** Hatfield conceded he is "quite knowledgeable about guns," that on three occasions he had bought guns and later exhibited and sold some at gun shows—without being licensed—and that because he knew the price of guns was moving upward he and appellant agreed that any increase in cost to Hatfield was not to exceed ten percent of the quoted price.

**9.** Jess Stockstill, apparently known to Hatfield, is not otherwise identified in our record.

**10.** Two Federal Alcohol, Tobacco and Firearms agents testified that in the course of their work

they would have known of inordinate buying of weapons in this country by OPEC nations and were unaware that was being done. (For whatever it is worth, the historical facts are that in July 1977 Egypt and Libya were engaged in border clashes and in September 1977 there was fighting in southern Lebanon between Palestinian guerillas and Lebanese Christian militiamen and during this period diplomats were striving to reconvene the Geneva peace talks on the Middle East; see The World Almanac (1978), 940, 945.)

aligned, resulting in the top of the form being lopped off. The order is addressed to:

"Metro Gun Distributors Assn.
New York, N.Y."

and refers to "attached invoices," presumably a copy of each one left with Hatfield since descriptions of the seven guns ordered match those invoiced.[11] At some point in time that Hatfield did not make clear, he received a confirmation letter from appellant with enclosed ATF forms (Department of Treasury Form 4473, required of every intrastate retail buyer of a firearm) for him to fill out and return. (At hearing on his motion for new trial appellant introduced one purportedly bearing Hatfield's signature, dated August 30, 1977.)

Hatfield continued to expect delivery and called appellant again, only to be put off. Finally around October 15, 1977 he talked with appellant, asked about the guns and received what he regarded as an unsatisfactory response. Accordingly, Hatfield told appellant he wanted to cancel the order and demanded "an immediate and early return" of his purchase money; he characterized appellant as "very congenial," expressing regret of inability to make delivery and declaring the money would be refunded, but it would take time and come in small amounts. Over the next five or six weeks appellant refunded $40.55 for the sales taxes in October, then thirty dollars and on November 7 a seventy dollar refund on the Galef 12 gauge shotgun. About the same time Hatfield posted a certified letter to appellant, demanding payment in full of the balance due and owing him, or Hatfield proposed to write some letter to various federal agencies and inform them of the less than satisfactory transactions with appellant. Hatfield denied receiving one hundred dollars from appellant on November 16, 1977,[12] but it undisputed that appellant made no more payments to Hatfield, giving one excuse or another when Hatfield was able to contact him.

Hatfield complained to the Tarrant County District Attorney, and on March 17, 1978 appellant was arrested by his investigators as soon as he walked into the newsroom of "The Fort Worth Star-Telegram." (Our understanding of the record is that appellant has remained confined since that day in lieu of bail.) Hatfield testified, over stoutly asserted objection, that he did not give his effective consent for appellant to deprive him of his money "under the circumstances that it was done" and that had he known he was not going to get the guns or, failing that, a refund in full he would not have delivered his checks to appellant.

In our best judgment, the evidence relating to the Hatfield transactions suggest a false pretext theory. In arguing about viability of the former offense of theft by false pretext denounced by the prior statutes, especially Article 1413, P.C. 1925 and see, e.g., *Maxwell v. State,* 134 Tex.Cr.R. 314, 115 S.W.2d 939 (1938)[13] and *Hesbrook*

---

11. Each of the invoices given Hatfield also indicate "Subject to Mfr's approval," and the F.O.B. boxes in Hatfield's had typed in "Mass/N.Y."

12. This denial was made several times during his examination, and from it arises appellant's second ground of error, contending the trial court should have granted a new trial on newly discovered evidence because after trial appellant came up with the cancelled check showing that payment had been made. At one point the following warm exchange occurred:

    "Q: Then, on November the 16th, he paid you another hundred dollars?
    A: No, sir.
    Q: Yes, sir.
    A: No, sir.
    THE DEFENDANT: Yes, sir.
    THE WITNESS: No, sir.

    MR. YOUNG: We object to the Defendant making his little comments.
    THE COURT: Sustained. Don't make any comments.
    THE WITNESS: No, sir."

13. Quoting approvingly from *Barnett v. State,* 119 Tex.Cr.R. 594, 43 S.W.2d 449, 452 (1931):

    "The gravamen of the offense of theft by false pretext is that accused came into possession of the property by a willing surrender of it to him by the owner, he, however, being induced to so deliver possession by a false pretext or device, *and* with the fraudulent intent on the part of accused at the very time he came into possession of it to appropriate it to his own use, followed by such appropriation. See *Porter v. State,* 23 Tex.App. 295, 4 S.W. 889."

*v. State,* 149 Tex.Cr.R. 310, 194 S.W.2d 260, 261 [14] (1946); contra: *Wagner v. State,* 544 S.W.2d 143, 145 [15] (Tex.Cr.App.1976), both appellant and State have overlooked *Draper v. State,* 539 S.W.2d 61, 67 (Tex.Cr.App. 1976), which holds that the essence of theft by false pretext remains:

> " . . . the offense consisted of essentially the same elements of the theft charged here. It included the element of knowledge on the part of the actor that the pretext was false. [citation omitted] Thus the cases involving theft by false pretext may be relied upon for guidance in reviewing the sufficiency of the evidence to show that the actor knew the statement of facts made by him were false, or that he did not intend to perform the promises made by him or knew that they would not be performed."

And, it must be further noted, the Legislature has retained the specific "intent to deprive the owner of property" as an essential element of the offense. Thus, V.T.C.A. Penal Code, § 31.03, "Theft," with its accompanying definitions in *id.* § 31.01, embraces a modified version of former offense of theft by false pretext just as the Legislature indicated in *id.* § 31.02.[16] So, it is as a "false pretext" case that we consider that the facts present an extremely close question as to sufficiency of the evidence under its "ab initio" doctrine. *Bearden v. State,* 487 S.W.2d 739, 742 (Tex.Cr.App.1972); *Howell v. State,* 478 S.W.2d 468 (Tex.Cr.App. 1972); *Kinder v. State,* 477 S.W.2d 584, 586 (Tex.Cr.App.1971).

However, we do not rule on grounds of error one and three for all of what has been said is to put in perspective the unassigned errors that we review in the interest of justice pursuant to Article 40.09, § 13, supra.

Though the offense of theft from Hatfield is alleged to have been committed on or about August 11 and the proof showed a transaction on that date and another on August 15, the State was permitted over objection to adduce testimony of extraneous offenses committed some four months thereafter. Charles Franklin Rutledge, a federally licensed firearm retailer, testified in substance that on December 8, 1977 he made an intrastate over-the-counter sale of a Weatherby 20 gauge shotgun to appellant. To consummate the transaction appellant was required to and, according to Rutledge, did complete and execute an ATF Form 4473, answering negatively certain questions and certifying correctness of his answers subject to prosecution for a felony offense for falsifying them, *viz:*

> a. Are you under indictment in any court for a crime punishable by imprisonment for a term exceeding one year?  NO
>
> b. Have you been convicted in any court of a crime punishable by imprisonment for a term exceeding one year?  NO
>
> c. Are you a fugitive from justice?  NO
>
> d. Are you an unlawful user of, or addicted to, marihuana or a depressant, stimulant, or narcotic drug?  NO "

and others we find unnecessary to set forth here. Rutledge testified that had appellant made an affirmative answer to questions a or b, he would not have sold the shotgun for

14. "It is now the settled law of the State that a false pretext is necessary to constitute the crime of theft by false pretext. The intent to deprive the owner of the property and subsequent appropriation of it, alone, is not sufficient. *Segal v. State,* (98 Tex.Cr.R. 485, 265 S.W. 911, 35 A.L.R. 1331); *Roe v. State,* 140 Tex.Cr.R. 387, 144 S.W.2d 1104 (1940)".

15. "Two modes of committing the offense are embraced in the provision as to lawful taking: namely, obtaining the property by false pretext, and obtaining it with an intent to deprive the owner of the value of property in question. 55 Tex.Jur.2d, Section 17, page 293."

16. The legislative intent in constituting theft a single offense as defined in § 31.03 was to eradicate prosecution of the prior separate offenses in order to, *inter alia,* avoid "embroil[ing] the courts in nice questions about the appropriateness of conviction under one offense label as opposed to another," Practice Commentary following § 31.02. Still, without labels, by statutorily defining that "deception" which induces consent and renders it other than effective, the earlier judicially developed concepts have been incorporated into statutory law; see Practice Commentary following § 31.-03, supra.

fear of losing his FFL.[17] This ATF Form 4473 became State's Exhibit 3.

Then, through ATF Agent John Slover, the State introduced an ATF certification dated May 23, 1978 to the effect that neither appellant nor any of his several companies "has been issued or denied a firearms ... license ... under federal laws."[18] It was developed that Agent Slover had known appellant for some time—some fifteen years in Texarkana where Slover had been a policeman and appellant a resident citizen—and he testified that appellant "may not purchase a firearm on that form," referring to the December 8, 1977 ATF Form 4473.

Next, the State called ATF Agent Charles E. Warnett who, over a "running" objection, testified to a visit to and conversation with appellant at his apartment October 11, 1977.[19] He asked appellant if he were "in the gun business," and appellant said "at that time" he was not, that "he had sold or taken orders for some guns and had sold at that time one gun" to a dentist named Dr. Stubblefield.[20] Warnett advised appellant that he could not deal in guns and could not own or possess a firearm, explaining the reason which, he indicated, appellant acknowledged and understood. He was shown the December 8, 1977 completed ATF Form 4473 and testified that some of the questions had been answered truthfully and some with deception, without specifying which; that it is a felony offense to make an incorrect answer; that on various dates appellant could not legally obtain or own a gun nor have a federal firearms license; that he told appellant during the October 11, 1977 conversation that appellant could not get, obtain or own guns legally, and gave him "a warning about continuing in that line of work."

While at the residence of appellant the agents were shown his records and "a lot of papers," including ATF Forms 4473 with the name, address and federal firearms license number of Best Products, and records indicating telephone calls to at least one sporting goods distributorship.

When State's Exhibit 3 was identified and the prosecutor began asking Rutledge questions about it, appellant objected "until the admissibility shall have been ruled on by the Court." The jury was excused and a colloquy ensued during which appellant objected, first, "for the reason that there is no issue before this Jury about this particular 20-gauge shotgun" and then, with a preliminary explanation, further objected, "For this to get before the Jury, it's going to indicate ... that this Defendant ... is guilty of other violations." The trial court stated, "Well, I'll charge the jury on extraneous offenses," and overruled the objection.[21] Appellant began to examine the

---

17. What is sometimes called in our record a "permit" we understand to be a Federal Firearms License, bearing a number for the particular licensee for identification purposes, issued by the federal Bureau of Alcohol, Tobacco and Firearms. But it appears that his license was not at risk in dealing with appellant under every circumstance, for Rutledge testified also that in about October 1977 they had an agreement whereby appellant would solicit prospective purchasers of guns, note the description of the firearm desired, collect the purchase price in advance, turn the data and money over to Rutledge who would order the gun under his FFL, arrange for the customer to come in, complete and execute ATF Form 4473 and thus acquire the firearm. We are not informed whether any transactions as contemplated by the agreement were in fact consummated.

18. Appellant's objection that the certification did not purport to resolve any issue in the case was overruled.

19. Special Agent Jack Barnett accompanied Agent Warnett but did not testify.

20. Dr. Stubblefield later confirmed the transaction, as a witness for appellant. Agent Warnett testified the shotgun had been bought from Best Products, a licensed firearm dealer with stores in and around Tarrant County.

21. Appellant further protested that the State was "forcing the Defendant not to testify when he wants to testify in this trial perhaps and he can't do it if this firearms transaction record or evidence from it is before this Jury." The prosecutor commented that appellant would not waive his right to testify by the exhibit's being before the jury. Appellant pointed out that if he did the State would be allowed to ask about prior convictions and they would indicate that appellant "also then violated the law on December the 8th." To this the trial court again remarked that it would charge on extraneous offenses, and overruled that objection.

witness on voir dire, but the trial court interrupted his questioning to remark, "I don't understand." The State then explained its theory,[22] and the trial court again overruled appellant's objection. After the jury returned and when the State actually offered its Exhibit 3, appellant again objected. As it indicated, the trial court charged the jury on extraneous offenses in considering intent.[23]

Thus not only did the State effectively convict appellant of federal firearms offenses on December 8, 1977, but it also managed to depict him as having a propensity to commit criminal acts, and to invite the jury to speculate which affirmative answer to the ATF Form 4473 questions precluded appellant from lawfully buying the Weatherby shotgun. That is, whether he was under indictment, had been convicted, was a fugitive from justice, was an unlawful user of or addicted to drugs, had been adjudicated mentally defective,[24] was discharged from military service under dishonorable conditions, was an illegal alien or one who had renounced his United States citizenship.

It is an established proposition of evidence that proof of similar happenings, extraneous offenses or prior specific acts of misconduct committed by a party is irrelevant to the contested material issues in the case on trial and, therefore, inadmissible. *Murphy v. State,* 587 S.W.2d 718, 721, and authorities cited in note 5 (Tex.Cr.App. 1979).

In a criminal proceeding, when the extraneous or similar transaction committed by an accused, sought to be admitted by the State, constitutes a criminal offense, introduction of that "extraneous offense" transaction is inherently prejudicial because the accused is entitled to be tried on the accusation made in the State's charging instrument and therefore cannot be tried for some collateral crime of which he has no notice. *Murphy,* supra; *Jones v. State,* 568 S.W.2d 847 (Tex.Cr.App.1978); *Walls v. State,* 548 S.W.2d 38 (Tex.Cr.App.1977); *Young v. State,* 159 Tex.Cr.R. 164, 261 S.W.2d 836 (Tex.Cr.App.1953); *Couch v. State,* 155 Tex.Cr.R. 585, 238 S.W.2d 198 (Tex.Cr.App.1951). Additionally, such introduction is inherently prejudicial because an accused's "propensity to commit crimes" is not an issue which is material to whether he is guilty of the specified conduct charged by the State; it follows therefore, that introduction of evidence establishing such a propensity constitutes a trial of the accused as a "criminal generally" which is prohibited. *E.g., Murphy,* supra; *Young,* supra; *Couch,* supra; *Clements v. State,* 147 Tex. Cr.R. 531, 182 S.W.2d 915 (Tex.Cr.App. 1944); see *Spivey v. State,* 146 Tex.Cr.R. 11, 171 S.W.2d 140 (Tex.Cr.App.1943). See also *Jones,* supra; *Etchiesen v. State,* 574 S.W.2d 753 (Tex.Cr.App.1978); *Cameron v. State,* 530 S.W.2d 841 (Tex.Cr.App.1975); *Albrecht v. State,* 486 S.W.2d 97 (Tex.Cr. App.1972).

But these evidentiary principles, as most, must in some circumstances give way. For extraneous transactions constituting offenses shown to have been committed by the accused [25] may become admissible upon

---

**22.** In pertinent part the prosecutor said that the State was "trying to demonstrate to this jury that at the time he took money for guns, he could not lawfully sell guns, obtain guns because in order to do that, he has to fill out a form ... and he's in the business of selling guns when he can't even lawfully obtain them. And he has been telling these people that he can lawfully obtain them and sell them and that goes to the heart of this case which is intent."

**23.** The jury was instructed that any testimony regarding commission of other offenses cannot be considered for any purpose "unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then, you may consider the same in determining the intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment, and for no other purpose."

**24.** In his final argument when the prosecutor came to this question he commented, "Well, there is no insanity defense here, certainly."

**25.** It is always required that the commission of the extraneous offense is clearly proved and the accused is shown to have been its perpetrator. *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr. App.1979); *Ransom v. State,* 503 S.W.2d 810 (Tex.Cr.App.1974); see also 23 T.J.2d *Evidence* § 195 (1961).

a showing by the prosecution both that the transaction is *relevant* to a *material* issue in the case [26] and the relevancy value of the evidence outweighs its inflammatory or prejudicial potential. *Holley v. State,* 582 S.W.2d 115 (Tex.Cr.App.1979); *Ruiz v. State,* 579 S.W.2d 206 (Tex.Cr.App.1979); *Jones,* supra.

In determining this balance of evidentiary relevancy against exclusionary policies in a direct evidence case presenting a contested issue, the court must look to the attributes of the extraneous offense shown by the State and decide whether such "a relationship between such evidence and the evidence necessary to prove that the accused committed the crime for which he stands charged" has been shown, *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Cr.App.1972), so that admitting it would be of assistance to the jury in resolving the contested issue. See *Rubio v. State,* 607 S.W.2d 498 (Tex.Cr.App.1980) (Concurring Opinion). When the contested issue is "intent" of the accused, generally discerned commonalities of the primary and extraneous offense suggest probative value to the jury on that issue. Thus, in *Rubio v. State,* supra, the Court upheld admission of testimony of an extraneous attempted sexual offense, having discussed and cited many other cases where extraneous offenses were properly admitted on the issue of intent upon a showing of some common features; the Court noted that attempted offense occurred "in the same manner, geographical location and within the approximate time frame as the offense charged." Still, there is and can be no set standard for, as observed in *Albrecht v. State,* supra, "The circumstances which justify the admission of evidence of extraneous offenses are as varied as the factual contexts ... in which the question ... arises," and every case "must be determined on its own merits." That is what we do here, and find that the December 8, 1977

federal firearms offenses were inadmissible on the issue of intent of appellant on or about August 11, 1977.

The federal firearms offense regarding ATF Form 4473 is denounced by 18 U.S.C., § 922(a)(6),[27] and it has been uniformly held by the federal circuit courts that specific intent is not an element of the offense, e.g., *United States v. Cornett,* 484 F.2d 1365 (CA 6, 1973); *United States v. Graves,* 394 F.Supp. 429, 433, n. 10 (D.C.Pa.1975) 554 F.2d 65 (CA 3, 1977); the gist of the offense is knowingly to make a false statement, *Cody v. United States,* 460 F.2d 34, 38 (CA 8, 1972); *United States v. Beebe,* 467 F.2d 222 (CA 10, 1972), certiorari denied 416 U.S. 904, 94 S.Ct. 1607, 40 L.Ed.2d 108 (1974), and it has been held that the culpable mental state of knowingly is proven when the evidence shows and the district court finds that the accused recklessly disregarded the truth of a declaration on ATF Form 4473, *United States v. Wright,* 537 F.2d 1144 (CA 1, 1976), certiorari denied 429 U.S. 924, 97 S.Ct. 325, 50 L.Ed.2d 292 (1976). Thus, the culpable mental state of appellant on December 8, 1977, whether knowing or reckless, bears no discernable relationship to evidence of intent to deprive Hatfield of his property on or about August 11, 1977; see *Thrush v. State,* 515 S.W.2d 122, 125–126 (Tex.Cr.App.1974) and *Powell v. State,* 478 S.W.2d 95, 98 (Tex.Cr.App.1972). Nor are we able to perceive any common features among unlawfully buying from a retail dealer and possessing a shotgun, and acquiring two checks as payment for weapons to be ordered with intent to deprive the owner of the proceeds of the checks. Compare *Cage v. State,* 167 Tex.Cr.R. 355, 320 S.W.2d 364, 367 (1958); *Converse v. State,* 386 S.W.2d 283, 285 (Tex.Cr.App.1965); and other cases cited in *Albrecht v. State,* supra, at n. 3.

---

**26.** *Coleman v. State,* 577 S.W.2d 695 (Tex.Cr.App.1978); *Buckner v. State,* 571 S.W.2d 519 (Tex.Cr.App.1978); *Finley v. State,* 573 S.W.2d 238 (Tex.Cr.App.1978); *Walls v. State,* 548 S.W.2d 38 (Tex.Cr.App.1977); *Halliburton v. State,* 528 S.W.2d 216 (Tex.Cr.App.1975).

**27.** The separate offense of possessing the Weatherby shotgun is proscribed by U.S.C. App., § 1202(a), characterized as "essentially regulatory in nature" by the Third Circuit in *United States v. Graves,* supra, at 69.

Our conclusion is that the admission of State's Exhibit 3 and the testimony concerning it are of a "disconnected substantive offense" and merely "tended to show that appellant was a criminal generally," *Ball v. State,* 118 Tex.Cr.R. 579, 39 S.W.2d 619, 620 (1931). Given the close question of sufficiency of the evidence to show a false pretext in the Hatfield transactions, their admissions were harmful to appellant and constitute reversible error.

For these reasons, the judgment of conviction is reversed and the cause remanded.

DALLY, J., dissented.

## OPINION ON STATE'S MOTION FOR REHEARING

ODOM, Judge.

This is an appeal from a conviction for theft. Punishment, enhanced under V.T.C.A., Penal Code Sec. 12.42(d), is life.

■ On original submission a panel of this Court reversed the conviction for erroneous admission of evidence. The panel found the error to be fundamental, it not having been raised in the brief. Just as error at trial may be waived by failure to object, on appeal error may be abandoned by failure to assert it in the brief. Because the issue was not raised by appellant before this Court, the panel should not have considered it. The matter does not constitute fundamental error that should be considered in the interest of justice. The State's motion for rehearing is granted.

We now consider the grounds of error raised in appellant's brief.

■ The first and third grounds of error challenge the sufficiency of the evidence to prove appellant acted with intent to deprive the owner of property and to prove the property was obtained without the owner's effective consent. Theft under V.T.C.A., Penal Code Sec. 31.03(a), (b)(1) requires proof of these two elements. Consent is not effective if induced by deception. V.T.C.A., Penal Code Sec. 31.01(4). Deception occurs if the defendant creates or confirms by words or conduct a false impression of fact that is likely to affect the owner's judgment in the transaction, and that the defendant does not believe to be true. Sec. 31.01(2)(A), supra. Appellant was apparently prosecuted under this theory.

Appellant was alleged to have stolen over $200 from Otis Hatfield. The record shows that appellant obtained an order from Hatfield for several firearms and that Hatfield paid appellant several hundred dollars when the order was placed. The guns were never delivered. Eventually, after many inquiries by Hatfield about delays in filling his order, he canceled the order and requested a refund. After several checks for partial refunds were received by Hatfield, he found it impossible to reach appellant regarding refund of the balance, still well in excess of the over $200 allegedly stolen.

In *Draper v. State,* 539 S.W.2d 61, 69, the Court said:

"It does not negate intent to deprive to say that the [owners] could have gotten their money back. As the State points out, the offense of theft has long been held to be complete when the property is obtained, if the other elements are present."

In this case the evidence is undisputed that appellant obtained and as of the time of trial still retained over $200 of Hatfield's money, and that Hatfield obtained none of the promised merchandise. The intent to deprive element was sufficiently proven at trial.

Turning to the issue of deception, we find the record reflects that Hatfield before placing his order for the guns asked appellant if he had the required federal firearms license. Appellant told Hatfield that his company did. This was a matter of fact upon which Hatfield, being familiar with federal law requirements for sale of firearms, clearly relied when he paid appellant in advance for the guns. Appellant's "company," it was shown, was an assumed name under which he was lawfully registered to do business, but which nevertheless did not have the required federal license about which Hatfield had inquired. We find the evidence sufficient to show appellant's de-

ception induced Hatfield's payment, and that Hatfield's consent therefore was not effective. See *Draper,* supra.

The first and third grounds of error are overruled.

■ In his other ground of error appellant asserts it was error to deny his motion for new trial based on newly discovered evidence of another check for $100 refunded to Hatfield, receipt of which Hatfield had denied on the witness stand. Two of the four requirements for obtaining a new trial on the basis of newly discovered evidence are that the evidence was unknown to the defendant before trial and that his failure to discover it was not due to lack of diligence. *Saunders v. State,* 572 S.W.2d 944, 955, quoting *Hernandez v. State,* 507 S.W.2d 209. Appellant admitted at the hearing on the motion for new trial that he knew of the check before trial and failed to subpoena the bank records. Neither of the two requirements stated above have been met in this case. We also note that even with an additional $100 refund, Hatfield still lost well over the $200 plus alleged in the indictment. The ground of error is overruled.

The judgment is affirmed.

CLINTON, Judge, dissenting.

The new code of criminal procedure recognized, acknowledged and confirmed the authority and power of this Court to consider "any unassigned error which *in the opinion of the Court of Criminal Appeals* should be reviewed in the interest of justice." [1] Article 40.09, § 13, V.A.C.C.P.

Early on the Court affirmed that it could review as "unassigned error" a claim not otherwise properly raised when "the facts relating to such claim are before us in the statement of facts approved by the trial judge," *Estrada v. State,* 406 S.W.2d 448, 449 (Tex.Cr.App.1966), especially if deprivation of a constitutional right had been somehow asserted: *McClellan v. State,* 413 S.W.2d· 391, 392 (Tex.Cr.App.1967) and *Allison v. State,* 423 S.W.2d 326, 327 (Tex.Cr. App.1968)—"The complaint in the record of the state's demand of the appellant to produce his driver's license or secondary evidence would be offered to make such proof will be considered as unassigned error. Art. 40.09, Sec. 13, C.C.P." [2]—*Dodd v. State,* 436 S.W.2d 149 (Tex.Cr.App.1969); *Johnson v. State,* 436 S.W.2d 906, 909 (Tex.Cr.App. 1968); *Heltzel v. State,* 462 S.W.2d 289, 290 (Tex.Cr.App.1971); *Stoddard v. State,* 475 S.W.2d 744, 746 (Tex.Cr.App.1972); and *Peoples v. State,* 477 S.W.2d 889 (Tex.Cr. App.1972) are but a few of a host of similar decisions.

However, the Court also indicated that "a serious question of law" might be discussed under § 13, *Bellah v. State,* 415 S.W.2d 418, 421 (Tex.Cr.App.1967), and it soon demonstrated that a matter noted by it or an improperly presented contention may yet be considered though not of constitutional dimension. See *Crothers v. State,* 480 S.W.2d 642 (Tex.Cr.App.1972): reversal "required" "because the record shows that his court-appointed counsel was appointed on the day the trial commenced and the record fails to show that appellant and his court-appointed counsel waived the time provided by law to prepare for trial" under Article 26.04(b), V.A.C.C.P.[3] Also in *Green v. State,* 490

---

1. All emphasis is mine unless otherwise indicated.

2. On the other hand, a contention not properly before the Court for review may still be examined in light of the record, but if it deals solely with matters not contained in any way in the record, review "in the interest of justice" is not "*required,*" e.g., *Jones v. State,* 478 S.W.2d 937, 940 (Tex.Cr.App.1972); or an examination of the record may cause the Court to conclude that "the ground of error does not *require* review 'in the interest of justice,'" *Smith v. State,* 478 S.W.2d 947, 948 (Tex.Cr.App.1972).

3. Similarly in *Henson v. State,* 530 S.W.2d 584 (Tex.Cr.App.1975) Judge Odom wrote for a unanimous Court:

"The sole ground of error raised by appellant's appointed attorney is without merit. Our reading of the record, however, reveals a violation of the mandatory provisions of Art. 26.04, V.A.C.C.P. In the interest of justice, we will consider such violation as unassigned error . . . as we did in *Crothers v. State.* . . ."

S.W.2d 826 (Tex.Cr.App.1973), the Court decided the essentially statutory question of whether a peace officer of a municipality may make a valid arrest outside the limits of his bailiwick; *Klueppel v. State*, 505 S.W.2d 572 (Tex.Cr.App.1974) records a reversal by the Court on account of grossly improper jury argument by the prosecutor "in view of the gravity of the error," which was reviewed in "the interest of justice," *id.*, at 575; "repeated improper questions of the prosecutor" about his juvenile record "denied appellant a fair trial" wrote Judge Odom for the Court in *Ruth v. State*, 522 S.W.2d 517, 519 (Tex.Cr.App.1975), and Judge Morrison concurred "because of the intolerable conduct of the prosecutor" and was willing to reverse for ineffective representation by counsel who failed to make proper objection to some sixty four such improper questions, *ibid.* Many more examples are collated by my dissenting opinion in *Bell v. State*, 620 S.W.2d 116, 127–128 (Tex.Cr.App.1980–1981). From all of which it appeared to me then—and does still:

> "Thus, what is reviewable 'in the interest of justice' seems to depend on the particular collective judgment of the affected members of the Court at any given moment..." [4]

Accordingly, the test is not, as Judge Odom now writes for the majority, "*funda-*

*mental error* that should be considered in the interest of justice," P. 677 unless, of course, that is what the majority is holding today, for the first time ever.

To perpetuation of manifest injustice suffered by this appellant, I respectfully dissent.

TEAGUE, Judge, dissenting.

On original submission, a majority of a panel of this Court, *sua sponte*, rather than see a miscarriage of justice occur, ordered appellant's conviction reversed because an extraneous offense had been improperly admitted into evidence during his trial. For whatever reason, the appellant's court appointed attorney on appeal failed to raise the issue in a ground of error. See Art. 40.09, Sec. 9, V.A.C.C.P. However, the panel found, pursuant to former Art. 40.09, Sec. 13, V.A.C.C.P.,[1] unassigned error, and held that the extraneous offense had been improperly admitted into evidence at appellant's trial, and ordered appellant's conviction reversed. The extraneous offense consisted of evidence and testimony that the appellant had made a false declaration on a United States Treasury form, which is a felony offense. See 18 U.S.C. Sec. 922(a)(6).[2] The majority of the Court today

---

4.   As well as Judge Roberts, joining me in that dissent was Judge Odom who earlier in *Voekel v. State*, 501 S.W.2d 313 (Tex.Cr.App.1973) had reviewed for the Court "in its entirety" a "voluminous record, consisting of over 2,000 pages" in order to discuss a contention (not otherwise properly presented for review) that the trial court erred "in allowing the State to introduce evidence 'concerning extraneous offenses' ...," *id.*, at 315.

1.   At the time appellant gave notice of appeal, Art. 40.09, Sec. 13, V.A.C.C.P., prior to amendment, provided in part that the Court of Criminal Appeals could review "any unassigned error which in the opinion of the Court of Criminal Appeals should be reviewed in the interest of justice." Since the notice of appeal was given prior to the amendment to Art. 40.09, this Court is statutorily authorized to consider and review unassigned error.

2.   This form became State's exhibit number 3. The form is required by the United States Government and must be completed when a person purchases a firearm, such as a shotgun.

See 18 U.S.C. Sec. 922(a)(6). An offense is committed if, in completing the form, a person makes a false declaration on the form. In this instance, the jury was not informed where on the form appellant had lied when he completed the form, merely being informed that one of the declarations he made was false. Thus, the jury was left to speculate which declaration was false. A reasonable reading of the form can lead to the conclusion that the appellant 1) was under indictment for a State or Federal criminal offense carrying a punishment exceeding one year imprisonment; or 2) had been convicted of a State or Federal criminal offense, punishable by imprisonment exceeding one year; or 3) was a fugitive from justice; or 4) was an unlawful user of, or addicted to, marihuana or a depressant, stimulant, or narcotic drug; or 5) had been adjudicated a mentally defective or had been committed to a mental institution; or 6) had been dishonorably discharged from the Armed Forces; or 7) was an illegal alien; or 8) was a person who had renounced his United States citizenship. Without question, an affirmative finding as to any

has summarily concluded, without citation of authority or discussion, that the erroneous admission into evidence of the extraneous offense "does not constitute fundamental error that should be considered in the interest of justice." In its opinion, it also chastises the panel for having even considered the issue. The opinion states: "Because the issue was not raised by appellant before this Court, *the panel should not have considered it.*" (Emphasis Added). For reasons hereinafter stated, I must respectfully dissent to the majority opinion.

Prior to the enactment of the present Code of Criminal Procedure, it was not uncommon for attorneys for the State and the defendant to file with the Clerk of this Court their respective briefs shortly prior to oral argument, or to do so as late as after the defendant's attorney had approached the podium to make his argument. There was then no particular format for an appellate brief to be in. See Title 10 of the 1925 Code of Criminal Procedure. Whatever pluses or minuses the former Code may have had, the Legislature of this State ordered its demise when it enacted the present Code of Criminal Procedure, which became effective January 1, 1966. Unquestionably, one of the purposes of the Legislature's enactment of Art. 40.09, V.A.C.C.P., which governs among other things the filing of briefs, was to give trial courts an opportunity to grant a new trial without the necessity of a defendant having to pursue a full appeal, where the trial judge recognized that eventually the conviction would be reversed. A trial judge, in making the determination whether or not a new trial should be granted, was given by the very wording and terms of Art. 40.09, Sec. 12, V.A.C.C.P., unlimited discretion in making that decision.[3] His decision to grant a new trial was not reviewable by this or any other court. Because the decisions of trial judges granting new trials are unreported, we are not apprised of how many new trials

one of the above would be highly prejudicial to an accused.

**3.** Art. 40.09, Sec. 12, V.A.C.C.P., provided in part, as follows:

may have been granted because a conscientious trial judge found "fundamental error" or "error reviewable in the interest of justice." I must believe, knowing and having known many such conscientious trial judges, that many new trials were granted for either of those reasons. Nevertheless, if a trial judge previously had the power, after reviewing error in the interest of justice, to grant a new trial, does it not follow that in this instance where the former provisions are applicable to this cause that this Court likewise has that same power? Or, to put it another way: where error is egregious to the point of being a glaring kind of error, is it not incumbent upon one or more judges of an appellate court to *sua sponte* raise and discuss such error?

The majority by its above statement, "Because the issue [of the admission into evidence of an extraneous offense] was not raised by appellant before this Court", implies that this Court has never, *sua sponte,* considered and ruled on such a contention. That is not so. This Court has in the past expressly reviewed such error as the panel did in this cause either "in the interest of justice" or as "unassigned error." In *Jones v. State,* 470 S.W.2d 874 (Tex.Cr.App.1971), Presiding Judge Onion, who was the author of the unanimous opinion, first stated that such error as here could not be considered as a raised ground of error. However, Judge Onion then expressly stated the following: "Nevertheless, we have examined the record . . . ," and thereafter discussed the issue. In *Randolph v. State,* 499 S.W.2d 311 (Tex.Cr.App.1973), then Commissioner Keith, the author of the opinion which was unanimously approved by the Court, first pointed out that the defendant's brief did not comply with the statute. He then expressly stated: "However, in the interest of justice, we have reviewed the record carefully but do not find error presented." (312). In *Voelkel v. State,* 501 S.W.2d 313 (Tex.Cr.App.1973), the ground of error con-

"It shall be the duty of the trial court to decide from the briefs *and oral arguments,* if any, whether the defendant should be granted a new trial by the trial court."

cerning the admission into evidence of extraneous offenses had the same defect as noted in *Jones* and *Randolph,* supra. However, Judge Odom, the author of the unanimous opinion, stated the following: "Nevertheless, the record in its entirety has been reviewed and we will discuss this contention." (315). In *Nichols v. State,* 511 S.W.2d 269 (Tex.Cr.App.1974), the defendant's brief was untimely filed. One of his grounds of error concerned the contention the trial court had erred by admitting into evidence an extraneous offense. Judge Roberts, the author of the unanimous opinion, stated the following: "his contention will be considered in the interest of justice. See Art. 40.09, Secs. 9 and 13, Vernon's Ann.C.P." (270). Thus, contrary to the remark that Judge Clinton made in his dissenting opinion in *Bell v. State,* 620 S.W.2d 116, 128 (Tex.Cr.App.1981), "Thus, what is reviewable 'in the interest of justice' seems to depend on the particular collective judgment of the affected members of the Court at any given moment," I find that when it comes to this Court's considering the admission into evidence of extraneous offenses, as "error reviewable in the interest of justice," depends not on the collective majority on a given day, but instead whether a collective majority has simply failed to adhere to *stare decisis,* as that term is defined in 1261 Black's Law Dictionary (1979), on a given day.

Our system of criminal justice is designed to adjudicate responsibility in a manner such that proceedings are as fair as possible, given the inherent limitations of human nature. To that end, the Code of Criminal Procedure was enacted by the Legislature, among other reasons, "to insure a fair and impartial trial" for the litigants. Art. 1.03(5), V.A.C.C.P. Furthermore, the Legislature has commanded this Court that "no affirmance or reversal of a case shall be determined on mere technicalities or on technical errors in the preparation and filing of the record on appeal." Art. 44.23, Id. By concluding that the appellant waived any error in the admission into evidence of the extraneous offense, I believe the majority effectively affirms the conviction on a "mere technicality", without due regard to the "proper administration" of justice.

By the terms and wording of Art. 40.09 and Chapter 44, V.A.C.C.P., the members of this Court are not required to search through an appellate record as though they were on a search mission. However, are we as judges of the highest criminal appellate court in this State, and the second highest appellate court in this Nation regarding criminal matters, next to the Supreme Court of the United States, precluded and prohibited, when making the determination of the merits of a particular *raised* ground of error, from noticing errors of an egregious nature, when such error significantly draws into question the correctness of the fact finding process made at a defendant's trial? I think not.

In this cause, appellant's court appointed counsel raised in his appellate brief the ground of error that the evidence was insufficient to sustain the verdict of the jury. However, counsel failed to raise in his brief by a separate ground of error the extraneous offense issue, although it is patently clear from a reading of the record that the admissibility of the extraneous offense was hotly contested at trial. Because of the very nature of the *raised* ground of error, that the evidence was insufficient, it was necessary that each member of this Court read and study the entire statement of facts, or, at a minimum, at least rely upon the fact that the judge who had been assigned the case had read the record from beginning to end. Having done this very thing, it is now apparent to me that the panel did not write on the issue involving the admissibility of the extraneous offense simply for its own self gratification, but instead saw as I did an error of such brilliance that it almost blinded me. The panel, therefore, saw its judicial duty and discussed and resolved the issue. Given the nature of the error, was the panel wrong in doing what it did? As previously noted, it certainly had precedent for doing just what it did.

Presiding Judge White of the then Court of Appeals, this Court's predecessor, stated over 100 years ago:

We do not feel called upon . . . to discuss and comment seriatim upon all the grounds of error complained of; our duty seems only to require that we should notice those errors respecting which, in our judgment, there may be some question, or some contrariety of opinion as to the propriety and correctness of the ruling. In regard to the others we will simply state that the supposed grounds of error which are not noticed and commented upon may be considered as not well taken; and, consequently, as to them the rulings of the [trial] court are sustained. *Early v. State,* 1 Tex.App. 248 (1876).

Similarly:

. . . when it is made to appear that any legal right of the accused has been violated, unless it be such right as the accused can be presumed to have waived, or be shown by the record to have been waived when such waiver is authorized by law, or where the irregularity would be cured by verdict, then this court, as the court of last resort in cases involving life or liberty, cannot do otherwise than reverse such judgment, whatever the trouble and inconvenience—agreeably to the plain provisions of the Bill of Rights, which declares that 'no citizen of this state shall be deprived of life, liberty, property, privileges, or immunities, or in any manner disfranchised, except by due course of the law of the land.' Const., art. I, sec. 19. *Long v. State,* 4 Tex.App. 81 (1878).

By dismissing the error regarding the improper admission into evidence of the extraneous offense as having been "waived", the majority also fails to do justice to the reality of our criminal justice system as it pertains to the appellate process. In this cause, appellant was represented by court appointed counsel on appeal because he was indigent and could not afford to employ counsel of his choice. Counsel on appeal was not trial counsel. For whatever reason, counsel failed to raise on appeal the material issue involving the improper admission into evidence of the extraneous offense, even though such error had been properly perfected at trial. However, I dare say there is not an attorney in this State who has handled many appeals who has not later regretted not raising a ground of error in a particular brief. Regardless, a defendant's liberty and freedom should not depend upon the vagaries of his counsel on appeal's abilities; especially where, as in this cause, a glaring but unraised error significantly draws into question the fact finding that was made at the trial.

So there will not be any misunderstanding of what I am attempting to point out, I emphasize the following: error reviewable in the interest of justice does not encompass just any kind of error, but encompasses error of a grievous nature. As previously pointed out, this Court has in the past considered, *sua sponte,* error concerning the admission into evidence of an extraneous offense. For other examples of what this Court has deemed to be fundamental error, error reviewable in the interest of justice, or constitutional error, see 4 *Texas Criminal Practice Guide,* Sec. 90.06[2][f]. Also see *McClellan v. State,* 413 S.W.2d 391 (Tex.Cr. App.1967); *Duckett v. State,* 454 S.W.2d 755 (Tex.Cr.App.1970); *Sanders v. State,* 482 S.W.2d 208 (Tex.Cr.App.1972); *Bingham v. State,* 523 S.W.2d 948 (Tex.Cr.App. 1975); *Young v. State,* 447 S.W.2d 911 (Tex. Cr.App.1969); *Baldwin v. State,* 499 S.W.2d 7 (Tex.Cr.App.1973); *Parker v. State,* 545 S.W.2d 151 (Tex.Cr.App.1977); *Misenheimer v. State,* 560 S.W.2d 98 (Tex.Cr.App. 1978); *Harris v. State,* 522 S.W.2d 199 (Tex. Cr.App.1975); *Thomas v. State,* 474 S.W.2d 236 (Tex.Cr.App.1971); *Grays v. State,* 487 S.W.2d 348 (Tex.Cr.App.1972); *Butler v. State,* 462 S.W.2d 596 (Tex.Cr.App.1971); *Lee v. State,* 555 S.W.2d 121 (Tex.Cr.App. 1977); *Cevilla v. State,* 515 S.W.2d 676 (Tex.Cr.App.1974); *Rich v. State,* 1 Tex. App. 206 (1876); *Sutton v. State,* 41 Tex. 513 (1874); *Scott v. State,* 31 Tex. 410 (1868); *Lunsford v. State,* 1 Tex.Ct.App. 448 (1876); *White v. State,* 1 Tex.App. 211 (1876); *Tischmacher v. State,* 153 Tex.Cr.R. 481, 221 S.W.2d 258 (Tex.Cr.App.1949). Attention is also directed to Judge Clinton's recent dissenting opinion in *Bell v. State,* supra, where he also set out examples of when error is reviewable in the interest of

justice, pursuant to Art. 40.09, Sec. 13, supra.

Simply because of the inherent prejudicial effects an extraneous offense has, it is only under the most limited of circumstances that this Court will uphold the admission into evidence of an extraneous offense. See *Albrecht v. State,* 486 S.W.2d 97 (Tex. Cr.App.1972). "The general rule in all English speaking jurisdictions is that an accused person is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. The rule is now deemed axiomatic and is followed in all jurisdictions." *Young v. State,* 159 Tex.Cr.R. 164, 261 S.W.2d 836 (Tex.Cr.App.1953). Also see *Spencer v. Texas,* 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967, Warren, Chief Justice, dissenting opinion). Such principle has been a part of the law of this State for over 100 years. *Cesure v. State,* 1 Tex.App. 19 (1876). Also see *Randolph v. State,* 499 S.W.2d 311 (Tex.Cr.App.1973); *Fore v. State,* 5 Tex.App. 251 (1878); *Persons v. State,* 3 Tex.App. 240 (1877); *Gilbraith v. State,* 41 Tex. 567 (1874). One of the reasons for the general rule of inadmissibility is that the admission into evidence of an extraneous offense has a tendency to draw away the minds of the jurors from the subject in issue, the primary offense, and to excite prejudice toward the accused and mislead the jurors as to the main issue they are to resolve, that is, whether or not the accused is guilty of the criminal offense for which he is on trial. *Gardner v. State,* 11 Tex.App. 265, 275 (1881).

By the facts of this cause, evidence of appellant's criminal intent when he took the complainant's money was entirely circumstantial, and was tenuous at best. The only issue in the case, when appellant took the complainant's money, was whether he took the money with the intent to keep it without supplying the promised guns, or did he intend to supply the guns as promised but lied after he realized that he would be unable to deliver the guns, and was at that time without ability to fully refund the money he had received from the complainant? When the jury was improperly informed that appellant had committed a felony offense by falsely completing the Federal firearms form, and then was left to speculate as to which of the boxes on the form contained a false answer, when he answered each question for each box in the negative, with each of the answers being prejudicial in varying degrees, the jury could not help but be clearly influenced to believe that appellant had a criminal intent when he initially accepted the complainant's money. Such was not mere injury, but was injury of a radical or serious character. *Gardner v. State,* Id. The improper admission of State's Exhibit Number 3 was error which "went to the integrity of the trial process itself," because it could have improperly influenced the jury in deciding what would otherwise have been a close issue. Absent this improper influence, the jury might very well have concluded that at the time the appellant obtained the complainant's money he did not have any criminal intent to defraud, but possibly an ill-conceived scheme to make a fast buck. Furthermore, the extraneous offense did not show that appellant never intended to obtain guns for his customers. It only shows that appellant is a criminal generally, in that he illegally purchased a gun, and feloniously falsified a Federal firearms form. It is this danger, that an accused will be convicted for being a criminal generally, rather than being convicted for committing the offense for which he is on trial, that the general prohibition against admitting into evidence an extraneous offense was designed to prevent. The extraneous offense should not have been admitted into evidence in this cause.

The facts of this case scream out for this error to be reviewed by this Court in the interest of justice. To the majority's holding that the admission into evidence of the extraneous offense is not reviewable, as error reviewable in the interest of justice, I must respectfully dissent. I must also dissent to the failure of the majority to give any reason for reaching its result, other than an amorphous reference to "waiver". The liberty and freedom of one of our citi-

zens, even one whose conduct may be highly suspect, as well as despicable, are too valuable to be placed on the end of a pitchfork and thereafter thrown onto the heap labeled "waiver of error by technicality." The Court fails today to do what I and others thought it was created to do, and that is to make sure that no citizen of this State was ever deprived of his freedom "except by the due course of the law of the land." Art. I, Sec. 19, Texas Constitution. I do not believe that this appellant has been accorded the due course of the law of this State to which he is entitled to receive.